UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| DUNKIN' DONUTS FRANCHISED RESTAURANTS LLC, *et al.*, | ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 07cv6320 |
| TEJANY & TEJANY, INC., *et al.*, | ) ) | Judge John W. Darrah |
| Defendants. | ) ) ) |  |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR A PRELIMINARY INJUNCTION

W. Scott Porterfield
Roger H. Stetson
BARACK, FERRAZZANO, KIRSCHBAUM,
& NAGELBERG
200 West Madison Street
Suite 3900
Chicago, Illinois 60606
(312) 984-3100

*Attorneys for Plaintiffs*
Dunkin' Donuts Franchised Restaurants LLC,
DD IP Holder LLC,
Baskin-Robbins Franchised Shops LLC, and
BR IP Holder LLC

Robert L. Zisk
David E. Worthen
GRAY, PLANT, MOOTY, MOOTY
& BENNETT, P.A.
2600 Virginia Avenue, N.W., Suite 1111
Washington, DC 20037
Telephone: (202) 295-2200
Of Counsel

Dated: November 8, 2007

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS .......................................................................................................... 2

       The Parties' Rights and Obligations Under the
       Settlement Agreement and Purchase Option Agreements .................................................. 3

       Defendants' Breaches of the Settlement Agreement and the POAs ................................... 5

ARGUMENT .............................................................................................................................. 7

    I. DUNKIN' DONUTS HAS A STRONG LIKELIHOOD OF SUCCESS ON THE
      MERITS .......................................................................................................................... 8

    A. Plaintiffs are Likely to Succeed on their Breach of Contract Claim Under the
       Settlement Agreement (Count I) Based on Defendants' Multiple Breaches of the
       Settlement Agreement and the POAs ........................................................................... 8

    B. Plaintiffs Are Likely to Succeed on Their Trademark Infringement Claim (Count II) . 9

    C. Plaintiffs Are Likely to Succeed on Their Unfair Competition and Trade Dress
       Infringement Claims (Counts III and IV ) ................................................................... 10

    II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
      IMMEDIATE INJUNCTIVE RELIEF ....................................................................... 11

    III. NO ADEQUATE REMEDY AT LAW EXISTS .......................................................... 11

    IV. THE BALANCE OF HARDSHIPS WEIGHS STRONGLY IN FAVOR OF
      PLAINTIFFS AND AN INJUNCTION WILL SERVE THE PUBLIC INTEREST .... 12

CONCLUSION ........................................................................................................................ 14

## TABLE OF AUTHORITY

### FEDERAL CASES

*American Bd. of Psychiatry and Neurology, Inc. v. Gloria Johnson-Powell, M.D.*,
129 F.3d 1 (1st Cir. 1997) ...........................................................................................11

*American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103 (2d Cir. 1978)...................12

*Aura Communications, Inc. v. Aura Networks, Inc.*, 148 F. Supp. 2d 91 (D. Mass. 2001) ..........11

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112 (1st Cir. 2006)............................9

*Burger King Corp. v. Majeed*, 805 F. Supp. 994 (S.D. Fla. 1992) ......................................10, 12

*Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828 (3d Cir. 1995).......................12

*Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*,
78 F.3d 1111 (6th Cir. 1996) ......................................................................................11

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
794 F.2d 38 (2d Cir. 1986) .........................................................................................13

*Dunkin' Donuts Inc. v. Gav-Stra Donuts, Inc.*,
139 F. Supp. 2d 147 (D. Mass. Apr. 10, 2001)................................................9, 10, 11

*Frish's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir.) .....................11

*Graham v. Med. Mut. of Ohio*, 130 F.3d 293 (7th Cir. 1997) .......................................................7

*Little Caesar Enters., Inc. v. R-J-L Foods, Inc.*, 796 F. Supp. 1026 (E.D. Mich. 1992) .............10

*Opticians Ass'n v. Independent Opticians*, 920 F.2d 187 (3d Cir. 1990) ...................................13

*McCall-Bey v. Franzen*, 777 F.2d 1178 (7th Cir. 1985) ..............................................................8

*Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*,
616 F.2d 1006 (7th Cir. 1980) ......................................................................................8

*Re/Max North Central, Inc. v. Cook*, 272 F.3d 424 (7th Cir. 2001) ............................................13

*S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371 (3d Cir. 1992)................................9, 10, 11, 13

*Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49 (D. Mass. 1990)...........................................13

## **STATE CASES**

*Johnson v. Cohan*, 1999 Mass. Super. LEXIS 19 (Mass. Supp. Feb. 3, 1999)............................13

## **MISCELLANEOUS**

15 U.S.C. § 1114.............................................................................................................................1

15 U.S.C. § 1065.............................................................................................................................9

McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 25.31....................................10

## INTRODUCTION

Plaintiffs seek a preliminary injunction to enjoin Defendants from their continued unauthorized use of Plaintiffs' proprietary marks and to require them to surrender to Plaintiffs possession of certain franchises pursuant to a Settlement Agreement between the parties. Defendants are former franchisees of Plaintiffs for franchises located in the Chicago metropolitan area. Defendants' Franchise Agreements were terminated by Plaintiffs based on Defendants' violation of various provisions of the Agreements requiring them to comply with the law in the operation of their franchised businesses. Specifically, Defendants failed to pay at least $750,000 in overtime wages to over 300 employees in compliance with the Fair Labor Standards Act ("FLSA"). Plaintiffs filed suit to enforce the termination of the Franchise Agreements.

Instead of obtaining possession of Defendants' shops as they were entitled to do, Plaintiffs entered into a Settlement Agreement with Defendants. Pursuant to the Agreement, the parties entered into 17 Purchase Option Agreements ("POAs"), one for each of Defendants' shops to be sold. Pursuant to the POAs, Defendants granted Plaintiffs or their designees the option to purchase the shops at the price designated in each POA. Plaintiffs had until November 5, 2007 to exercise their option under the POAs, which they did for 15 of the shops.

Defendants have breached a Settlement Agreement between the parties by failing to fulfill their obligations under the Agreement to facilitate closing on the transfer of Defendants' shops to third party purchasers. Defendants have engaged in a pattern of obstruction and delay, and have generally failed to cooperate in the sale of the shops. All the while, Defendants continue to operate the franchises and reap the benefits of operating under Plaintiffs' trademarks. Pursuant to the Settlement Agreement, Defendants specifically agreed that in the event that they breached their obligations under the POAs that Plaintiffs are entitled to specific performance of their obligation to transfer the shops to Plaintiffs.

On November 7, 2007, Plaintiffs sent Defendants a notice informing them that they were in breach of the Settlement Agreement and POAs, demanding that they immediately transfer possession of the shops to Plaintiffs as required by the Settlement Agreement, and that they cease using Plaintiffs' trademarks, trade names, and trade dress. Defendants have refused to comply. Accordingly, Plaintiffs seek an order requiring Defendants to surrender possession of their franchises to Plaintiffs, and to bar Defendants from their continued unlicensed use of Plaintiffs' proprietary marks in violation of the Lanham Act, 15 U.S.C. §§ 1114 *et seq.*

1

### STATEMENT OF FACTS

1.     Plaintiffs Dunkin' Donuts Franchised Restaurants LLC and Baskin-Robbins Franchised Shops LLC are engaged in the business of franchising independent business persons to operate Dunkin' Donuts and Baskin-Robbins shops throughout the United States.  Plaintiffs' franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin' Donuts and Baskin-Robbins and to operate under the Dunkin' Donuts and Baskin-Robbins Systems.  (Certification of Kathryn Thomas, Ex. 1, ¶¶ 3, 10) (attached hereto).

2.     Dunkin' and Baskin-Robbins operate as separate companies.  However, they pursue or permit joint development of units in selected markets, which are commonly referred to as "combo" shops.  *Id.* ¶ 17.

3.     Defendants are former franchisees of Dunkin' and/or Baskin-Robbins for nineteen franchises in the Chicago metropolitan area.  Defendants were formerly licensed to use Dunkin' and/or Baskin-Robbins' trademarks, trade names, and trade dress pursuant to Franchise Agreements for each shop.  *Id.* ¶¶ 18-38.

4.     DD IP Holder LLC is the owner of the trademark, service mark, and trade name "Dunkin' Donuts," and related marks.  Dunkin' Donuts has the exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1960 to identify its doughnut shops, and the doughnuts, pastries, coffee, and other products associated with those shops.  *Id.* ¶ 5.

5.     DD IP Holder LLC owns numerous federal registrations for the mark Dunkin' Donuts, and related marks.  Each of these registrations is in full force and effect, and is incontestable, pursuant to 15 U.S.C. § 1065.  The Dunkin' Donuts trademarks and trade name are distinctive and famous and have acquired secondary meaning.  The Dunkin' Donuts trademarks and trade name are utilized in interstate commerce.  The Dunkin' Donuts marks have been very widely advertised and promoted by Dunkin' Donuts over the years.  Dunkin' Donuts and its franchisees have expended approximately $1,500,000,000 in advertising and promoting the Dunkin' Donuts marks over the last thirty-five years.  Dunkin' Donuts spent approximately $167,000,000 in fiscal year 2005 alone on advertising and promotion.  *Id.* ¶¶ 6-9.

6.     BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks.  Baskin-Robbins has the exclusive license to use and license others to use these marks and trade names and has used them continuously since

approximately 1947 to identify its ice cream stores, and the ice cream and other products associated with those stores. BR IP Holder LLC owns numerous federal registrations for the mark "Baskin-Robbins" or derivations thereof, as well as related marks. Each of these registrations is in full force and effect, and most of them are incontestable pursuant to 15 U.S.C. § 1065. The Baskin-Robbins trademarks are utilized in interstate commerce. The Baskin-Robbins marks have been very widely advertised and promoted by Baskin-Robbins over the years. As a result, the Baskin-Robbins marks have become famous throughout the United States. *Id.* ¶¶ 12-16.

**The Parties' Rights and Obligations Under the**
**Settlement Agreement and Purchase Option Agreements**

7.    On August 15, 2005, Plaintiffs' predecessors-in-interest filed a lawsuit against Defendants in the United States District Court for the Northern District of Illinois based on Defendants' breaches of their Franchise Agreements. *Dunkin' Donuts Incorporated v. Tejany & Tejany, Inc., et al.*, C.A. No. 05-C-4770. Plaintiffs alleged that Defendants breached various provisions of the Franchise Agreements requiring them to comply with the law in the operation of their franchised businesses, warranting termination of the Agreements. Specifically, Plaintiffs alleged that Defendants had failed to pay overtime wages to numerous employees in compliance with the Fair Labor Standards Act ("FLSA"). *Id.* ¶ 39.

8.    At approximately the same time that the lawsuit was pending, the United States Department of Labor conducted an investigation into Defendants' employment practices and determined that Defendants had failed to pay overtime wages as required by the FLSA. *Id.* ¶ 40.

9.    Defendants ultimately settled their dispute with the Department of Labor by agreeing to pay $750,000 in back overtime wages to over 300 current and former employees. *Id.* ¶ 41.

10.    In May 2007, Plaintiffs and Defendants settled their lawsuit. The parties entered into a Settlement Agreement dated May 9, 2007 reflecting the terms of settlement. On May 31, 2007, the parties dismissed the lawsuit without prejudice. *Id.* ¶ 42.

11.    Pursuant to Paragraph 1 of the Settlement Agreement, the parties entered into 17 Purchase Option Agreements ("POAs"), one for each of Defendants' shops to be sold. *Id.* ¶ 43. Pursuant to the POAs, Defendants granted Plaintiffs or their designees the option to purchase the

3

shops at the price designated in each POA. Plaintiffs had until November 5, 2007 to exercise their option under the POAs. Ex. 1C.

12.    Plaintiffs timely exercised their option to purchase 15 of the shops and have found purchasers to assign their rights to in 13 of those POAs. (Certification of Kevin Duperre, Ex. 2, ¶ 4) (attached hereto).

13.    Pursuant to the POAs, Defendants had certain routine obligations in order to facilitate the prompt sale of the shops, including but not limited to, entering into Plaintiffs' customary agreements to provide for the assignment of Defendants' rights to the purchasers, complying with all provisions of the law pertaining to bulk transfers, providing to the purchaser all governmental licenses and permits required to lawfully operate the shops, executing and delivering to the purchasers a bill of sale warranting that there are no encumbrances on the property to be transferred, and executing and delivering to the purchasers a Letter of Representation (which is attached to the POAs), in which Defendants make certain warranties and representations regarding the status of the assets to be sold. Ex. 1C.

14.    Pursuant to Paragraph 5 of the Settlement Agreement, the closing date for the transfer of the shops is to be determined by Plaintiffs. Ex. 1B, ¶ 5.

15.    The real estate for the North Aurora Shop is owned by Defendant Nooruddin Sadruddin's wife. Pursuant to Paragraph 3 of the Settlement Agreement, Defendants were required to provide Plaintiffs a lease for the North Aurora Shop on the following terms: a five year term with two five year options, $10,000 a month in base rent, and a 3% increase in base rent every five years. *Id.* ¶ 3.

16.    Pursuant to Paragraph 4 of the Settlement Agreement, Defendants agreed to transfer the shops "free and clear of all liens and encumbrances." *Id.* ¶ 4.

17.    The parties specifically negotiated the remedy in the event that Defendants breached their obligation to transfer the shops pursuant to the POAs. Pursuant to Paragraph 12 of the Settlement Agreement:

> In the event that defendants breach their obligation to transfer the shops pursuant to the Purchase Option Agreements, and Dunkin' elects to file suit under this Agreement, then all parties acknowledge that Dunkin', if successful, is entitled to specific performance of those obligations and that defendants shall not contend that the breach is compensable in monetary damages. Defendants also agree to indemnify Dunkin' for all legal costs, including attorneys' fees, incurred in enforcing this provision.

4

Further, if defendants contest the purchase price obtained by Dunkin' for the shops, or if defendants allege that Dunkin' breached this Agreement in any other way, the obligations of defendants to pay monies under this Agreement and to transfer or convey the shops are not extinguished and defendants' <u>exclusive</u> remedy for Dunkin's alleged breach is a claim for monetary damages. In no event shall defendants be entitled to remain in any franchise relationship or use the Dunkin' or Baskin-Robbins trademarks, trade names, or trade dress beyond the date proposed for closing by Dunkin'.

*Id.* ¶ 12.

18.     Thus, Defendants agreed that in the event that they breached the POAs they would immediately transfer the shops to Plaintiffs. *Id.*

## **Defendants' Breaches of the Settlement Agreement and the POAs**

19.     Defendants have knowingly, purposefully, and repeatedly breached the terms of the Settlement Agreement and POAs.

20.     Defendants have delayed on multiple occasions closing on the sale of several of the franchised businesses. Specifically, the sale of the Irving Park Road, Barrington Road, and Glen Ellyn Shops had been scheduled for October 23, 2007, the sale of the Willowbrook Shop had been scheduled for October 15, 2007, the sale of the Hinsdale and Hodgkins Shops had been scheduled for October 25, 2007, and the sale of the St. Charles Shop had been scheduled for October 23, 2007. In each instance, Defendants were unable to close on the sale of the shops on the established date. Ex. 2, ¶ 5.

21.     Despite the obligation to transfer the franchised businesses free and clear of all liens and encumbrances, Defendants Sunrose, Inc., Al-Fatima, Inc., Fatima & Farida, Inc., Sardinia, Inc., Sabeen, Inc., and Shaker Khanoo, Inc. have over ten million dollars in liens against them. Upon information and belief, these liens relate to loans for Defendant Sadruddin's hotel business. Unbeknownst to Plaintiffs, the liens were placed on the businesses at approximately the same time Defendants were negotiating the terms of the Settlement Agreement. *Id.* ¶ 6.

22.     Defendants have repeatedly failed to provide a lease for the North Aurora Shop that conforms to the required terms under the Settlement Agreement, as referenced in Paragraph 53 above. After almost two months of asking, on August 26, 2007, Defendants ultimately produced to Plaintiffs a lease that included percentage rent and base rent that was not called for

in the Settlement Agreement. When Plaintiffs raised this issue, Defendants ultimately revised the lease by deleting the percentage rent terms but including base rent increases that were not called for in the Settlement Agreement. That deficient lease was not provided to Plaintiffs until October 29, 2007. To date, Defendants have refused to produce a lease for the North Aurora Shop in compliance with the Settlement Agreement and, as a result, Plaintiffs were unable to exercise their option to purchase the shop. Ex. 2, ¶ 7.

23.     Similarly, on July 12, 2007, Plaintiffs asked for a copy of the lease for the Westmont Shop. Plaintiffs have never received that lease. *Id.* ¶ 8.

24.     Defendants have unreasonably delayed providing landlord contact information. Before the shops can be transferred, the landlords must approve the assignment of the leases to the purchasers. Plaintiffs first asked for this basic information on July 12, 2007. After numerous follow up requests, on August 26, 2007, Defendants produced a list of landlord names without telephone numbers or contact information. It was not until October 29, 2007 before Defendants provided any of the requested information. *Id.* ¶ 9.

25.     When Plaintiffs asked for tax identification numbers for Defendants Sabeen, Inc., Fatima & Farida, Inc., and Shaker Khanoo, Inc. in order to conduct up to date lien searches, Defendants' response was that they do not have such information. *Id.* ¶ 10.

26.     Bulk Sales Stop Orders notify a prospective purchaser of any outstanding taxes owed or lien rights the state may have against the asset being sold. Defendants have failed to provide proof that they have procured Bulk Sales Stop Orders from the Illinois Department of Revenue, which is a prerequisite to closing. *Id.* ¶ 11.

27.     Defendants delayed for over a month in providing corporate tax returns to the prospective purchasers so that they could evaluate the finances of the businesses prior to purchasing. On July 30, 2007, Defendants sent what purported to be the tax returns for each corporate Defendant. However, in reality, it was the same tax return produced multiple times *Id.* ¶ 12.

28.     Defendants have failed to provide Letters of Representation pursuant to the POAs. *Id.* ¶ 13.

29.     Defendants attempted to delay closing for two shops based on the alleged vacation of their banker. Presumably, no one else at the bank was capable of attending the closing. *Id.* ¶ 14.

30.     Until last week, Defendants Royal Crown, Inc. and Khurshid & Zulfiquar, Inc. had been dissolved as corporations for several years. Accordingly, their status prevented closing on the sale of their shops. *Id.* ¶ 15.

31.     Defendants' postponements of the closings has also had a significant impact on the purchasers of the shops, who have hired employees and closed on loans for the purchase of the businesses in anticipation of established closing dates. Upon information and belief, Defendants' postponements have cost the purchasers thousands of dollars a week in labor costs. On November 7, 2007, Plaintiffs sent Defendants a notice informing them that they were in breach of the Settlement Agreement, that they were no longer entitled to use Plaintiffs' trademarks, trade names, and trade dress, and demanding that they immediately transfer the shops to Plaintiffs. *Id.* ¶ 16.

32.     On November 7, 2007, Plaintiffs sent Defendants a notice informing them that they were in breach of the Settlement Agreement, that they were no longer entitled to use Plaintiffs' trademarks, trade names, and trade dress, and demanding that they immediately transfer the shops to Plaintiffs. Ex. 1, ¶ 44.

## ARGUMENT

The standard for a temporary restraining order and preliminary injunction are identical. The applicant has the burden of showing: (1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm if injunctive relief is denied. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). If the petitioner satisfies the initial three-step burden, the court must balance the irreparable harm to the nonmoving party if the injunction is granted against the irreparable harm to the moving party if the injunction is denied. *Id.* The court also must consider the effect of the injunction on non-parties. *Id.* Because Plaintiffs can affirmatively establish these necessary factors, injunctive relief should be granted.

## I. PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

As established below, Plaintiffs have a strong likelihood of success on all of its claims: (1) breach of contract; (2) trademark infringement; (3) unfair competition; and (4) trade dress infringement.

### A. Plaintiffs are Likely to Succeed on their Breach of Contract Claim Under the Settlement Agreement (Count I) Based on Defendants' Multiple Breaches of the Settlement Agreement and the POAs.

Plaintiffs are more than likely to succeed on their claim for breach of contract based on Defendants' failure to abide by the terms of the Settlement Agreement. As a matter of course, the courts have routinely enforced the terms of a valid settlement agreement. "Settlement agreements are highly favored and will be enforced whenever possible." *McCall-Bey v. Franzen*, 777 F.2d 1178, 1195-1196 (7th Cir. 1985). "The law generally favors and encourages settlements." *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1013 (7th Cir. 1980). "Settlements also contribute greatly to the efficient utilization of scarce federal judicial resources." *Id.* at 1014 n.10. "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." *Id.* at 1014.

In this case, there can be no dispute that Defendants breached the Settlement Agreement and POAs. Pursuant to those agreements, Defendants were required to take certain steps in order to facilitate the prompt transfer of the shops. Statement of Facts ("SOF") ¶¶ 13-16. Instead of fulfilling their obligations, Defendants have instead engaged in a pattern of obstruction and delay, and have generally failed to cooperate in the sale of the shops. Defendants have, among other things, failed to close on several transfers on the established dates for closing, encumbered the shops with millions of dollars in liens, failed to provide leases for several shops, failed to secure bulk sales stop orders, and failed to timely provide tax returns and landlord contact information in order to facilitate closing. *Id.* at ¶¶ 20-31.

Pursuant to the Settlement Agreement, Defendants specifically agreed that in the event that they breached their obligations under the POAs that Plaintiffs are entitled to specific

8

performance of their obligation to transfer the shops to Plaintiffs. *Id.* at ¶ 17. Thus, Defendants contractually agreed to the very relief sought by Plaintiffs by this Motion.

The transfer provision was designed to ensure that in the event Plaintiffs determined that Defendants were in default under the Settlement Agreement, Defendants could not continue to use Plaintiffs' proprietary marks while the parties litigated the issue of default. The language in the Settlement Agreement was expressly agreed to and was understood by the parties, and should be enforced. Accordingly, Plaintiffs more than likely to succeed on Count I of the Complaint.

### B.    Plaintiffs Are Likely to Succeed on Their Trademark Infringement Claim (Count II).

Because Plaintiffs are likely to succeed on their breach of contract claim, Defendants no longer have a license to use Plaintiffs' trademarks. To prevail on a trademark infringement claim, "a plaintiff must show that it owns the mark in question, that the defendant's mark is similar to or the same as the plaintiff's mark, and that defendant's use of the mark is likely to cause confusion among consumers." *Dunkin' Donuts Inc. v. Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d 147, 158 (D. Mass. 2001). Applying these elements here, Plaintiffs have demonstrated a strong likelihood of success on their trademark infringement claim.

Plaintiffs' marks have been properly registered in accordance with the Lanham Act (SOF ¶¶ 5, 6) and are thus valid and legally protectable. *See* 15 U.S.C. § 1065. *See also Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 117 (1st Cir. 2006) ("Registration is 'prima facie evidence of the validity of the registered mark.'") (quoting 15 U.S.C. § 1115(a)). Defendants have used, and continue to use, these marks in offering doughnuts, ice cream, and related products for sale.

Turning to the final element, "'there is a great likelihood of confusion when the infringer uses the exact trademark' as the plaintiff." *See S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (quoting *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 195 (3d Cir. 1990)). In such cases, the "likelihood of confusion is inevitable." *Id.* In fact:

> Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. *Such cases are 'open and shut '* and do not involve protracted litigation to determine liability for trademark infringement.

*Id.* (quoting McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 23:3) (emphasis added). Consequently, "[t]he franchisor has the power to terminate the relationship where the

terms of the franchise agreement are violated.  Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act."  *S&R Corp.*, 968 F.2d at 375.  In this case, Defendants are using Plaintiffs' marks even though their license to do so has been terminated.

Indeed, "[t]he continued use of a trademark after breach of a franchise agreement is alone dispositive of the infringement issue."  *Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d at 158.

> Both *Burger King Corp. v. Hall*[, 770 F. Supp. 633, 637 (S.D. Fla. 1991)] and *Burger King Corp. v. Mason*[, 710 F.2d 1480, 1494 (11th Cir. 1983)] reflect well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement.

*See Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1002-03 (S.D. Fla. 1992).

> Once a license contract is terminated, there is no doubt that the ex-licensee has no authorization or consent to continue use of the mark.  After the license has ended, the ex-licensee must stop use of the mark.  Continued use by an ex-licensee of the licensor's mark constitutes a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor.  As the Eleventh Circuit observed:  'Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks.'
>
> . . . Understandably, many ex-franchisees and ex-licensees are reluctant to give up use of the mark.  Nevertheless, they clearly can be enjoined from any such further use.

*See* McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 25.31.  *See also Little Caesar Enters., Inc. v. R-J-L Foods, Inc.*, 796 F. Supp. 1026, 1034-35 (E.D. Mich. 1992) (former franchisee's continued use of franchisor's trademark after termination of rights to do so constituted likelihood of confusion).

Accordingly, the likelihood of confusion is inevitable, and the Court should find that Plaintiffs have demonstrated a strong likelihood of success on their trademark infringement claim.

### C.    Plaintiffs Are Likely to Succeed on Their Unfair Competition and Trade Dress Infringement Claims (Counts III and IV).

"[L]ikelihood of confusion is the essence of an unfair competition claim.  Thus the same factors are considered under § 1125(a) [Lanham Act unfair competition and trade dress claims]

as are considered under § 1114 [Lanham Act trademark infringement claims]." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996). Plaintiffs have made the requisite showing, and has demonstrated a strong likelihood of success on these claims as well. *See* Section I.B., *supra*.

**II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF IMMEDIATE INJUNCTIVE RELIEF.**

Where a plaintiff in a trademark infringement case has demonstrated a likelihood of success on the merits irreparable injury almost inevitably follows and, indeed, is presumed. *See American Bd. of Psychiatry and Neurology, Inc. v. Gloria Johnson-Powell, M.D.*, 129 F.3d 1 (1st Cir. 1997) ("[A] trademark plaintiff who demonstrates a likelihood of success on the merits creates a presumption of irreparable harm."); *Aura Communications, Inc. v. Aura Networks, Inc.*, 148 F. Supp. 2d 91 (D. Mass. 2001) (in a trademark case, the court stated that "[w]here a likelihood of success is established, irreparable harm is presumed."). As demonstrated above, irreparable harm is presumed because Plaintiffs are likely to succeed on the merits of the case. Hence, Plaintiffs have been and will continue to be irreparably harmed by Defendants' unlicensed and unauthorized use of their marks.

Moreover, a franchisor, like any trademark owner, has the right to license others to use its trademarks only in the manner that it prescribes. The unauthorized or unlicensed use of those marks creates a situation where the franchisor no longer can control the reputation and goodwill of its trademark, let alone the products being marketed and sold. A franchisor lacks control over its trademarks when a franchise agreement is terminated and yet the franchisee continues to utilize the franchisor's trademarks – which is the precise situation here. In such circumstances, the courts have consistently recognized a franchisor's right to an injunction preventing the continued unauthorized use of its trademarks. *E.g., Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d at 158 ("The continued use of a trademark after breach of a franchise agreement is alone dispositive of the infringement issue."); *Frish's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 646-47 (6th Cir.), *cert. denied*, 459 U.S. 916 (1982) (after proper termination of a franchise agreement, the continued use by former franchisees of franchisor's trademark constitutes a violation of Section 43(a) of the Lanham Act); *S&R Corp.*, 968 F.2d at 375 ("Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act."). Here, Plaintiffs have invested a tremendous amount of resources over the years

11

in building the considerable goodwill associated with their marks. SOF ¶¶ 5, 6. Defendants'
conduct in continuing to operate their shops after their license has been terminated substantially
interferes with Plaintiffs' ability to control the quality of the goods and services, which
Defendants continue to provide under the proprietary marks.

Plaintiffs' lack of control over their marks is demonstrated in other ways as well.
Customers may believe they are dealing with authorized franchisees of Plaintiffs and believe
they are purchasing authentic Dunkin' Donuts and Baskin-Robbins goods and services, when in
fact they are not. There can be no realistic way to determine damages under these circumstances.
Accordingly, ample justification exists for the finding of irreparable injury.

## III.    NO ADEQUATE REMEDY AT LAW EXISTS.

No adequate remedy at law exists that would remedy the situation. Plaintiffs are being
irreparably harmed by Defendants' refusal to fulfill their obligations under the Settlement
Agreement and POAs, and by their unlicensed use of Plaintiffs' proprietary marks. Money
damages cannot compensate Plaintiffs for Defendants' conduct. Moreover, the parties have
expressly agreed that specific performance of Defendants' obligations is the appropriate remedy
under these circumstances.

## IV.    THE BALANCE OF HARDSHIPS WEIGHS STRONGLY IN FAVOR OF
PLAINTIFFS AND AN INJUNCTION WILL SERVE THE PUBLIC INTEREST.

The harm to Plaintiffs from Defendants' unlicensed use of their marks outweighs any
harm the Defendants may suffer from the grant of the requested injunction. In contrast to the
irreparable harm suffered by Plaintiffs, any harm to Defendants is completely self-inflicted and
thus cannot be deemed irreparable as a matter of law. "One who adopts the mark of another for
similar goods acts at his own peril," because he has no claim to the profits or advantages thereby
derived. *See American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir.
1978). *See also Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir.
1995) (self-inflicted harm cannot be deemed "irreparable"); *S&R Corp.*, 968 F.2d at 379
(franchisee who ceased paying royalties "brought much of the difficulties of which he complains
upon himself."). "Defendants simply have no equitable standing to complain of injury should
their infringements be preliminarily enjoined." *Majeed,* 805 F. Supp. at 1006.

12

Moreover, any self-inflicted harm that might be suffered by Defendants would be insignificant when balanced against the irreparable injury to the goodwill that Plaintiffs have created through the expenditure of hundreds of millions of dollars in advertising and promoting their marks over the years. *See Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49, 51 (D. Mass. 1990) (holding that plaintiff's expenditures on four years' worth of advertising and promotion outweighed harm to infringers). The balance of harms weighs decisively in Plaintiffs' favor.

Additionally, through enactment of the injunctive relief portions of the Lanham Act, Congress has already declared the public interest in authorizing injunctive relief to protect proprietary marks against infringing activities. The basis of a trademark infringement action is whether the public is likely to be confused as to the source of the products in question, as well as the right of the public not to be deceived or confused. Federal courts have agreed and expressed the similar public interest in protecting a party's proprietary marks. *See Opticians*, 920 F.2d at 195 (citing McCarthy, 2 *McCarthy, Trademarks and Unfair Competition* § 30:21). *See also Re/Max North Central, Inc. v. Cook*, 272 F.3d 424, 433 (7th Cir. 2001) (stating that the public "has an interest in knowing with whom they do business and whether or not the agent is a[n authorized] franchisee"); *S&R Corp.*, 968 F.2d at 379 (public interest favors granting injunction against use of marks by terminated franchisee); *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("the public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion").

Furthermore, the public has an interest in the enforcement of contracts. *See, e.g., Johnson v. Cohan*, 1999 Mass. Super. LEXIS 19, at *18 (Mass. Supp. Feb. 3, 1999) (stating that, with respect to a contract providing the parties with reciprocal rights to purchase each other's land at a predetermined price, "enforcement of the provision [at issue] serves not only the individual interests for which it was devised, but the *public interest in enforcement of contracts*.") (emphasis added).

Finally, the prospective purchasers of Defendants' shops have an interest in the issuance of an injunction. Several of them have hired employees and closed on loans in anticipation of established closing dates that Defendants ignored. These purchasers are losing thousands of dollars a week as a result of Defendants' conduct.

13

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant their
Motion for a Preliminary Injunction.

Respectfully submitted,

/s/ Roger H. Stetson
W. Scott Porterfield
Roger H. Stetson
BARACK, FERRAZZANO, KIRSCHBAUM,
& NAGELBERG
200 West Madison Street
Suite 3900
Chicago, Illinois 60606
(312) 984-3100

*Attorneys for Plaintiffs*
Dunkin' Donuts Franchised Restaurants LLC,
DD IP Holder LLC,
Baskin-Robbins Franchised Shops LLC, and
BR IP Holder LLC

Robert L. Zisk
David E. Worthen
GRAY, PLANT, MOOTY, MOOTY
& BENNETT, P.A.
2600 Virginia Avenue, N.W.
Suite 1111
Washington, DC 20037
Telephone: (202) 295-2200
Facsimile: (202) 295-2250

Of Counsel

Dated: November 8, 2007

14