**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| DUNKIN' DONUTS FRANCHISED RESTAURANTS LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TEJANY & TEJANY, INC., *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 07cv6320<br>)<br>)    Judge John W. Darrah<br>)<br>)<br>) |

## CERTIFICATION OF KEVIN DUPERRE

1.    My name is Kevin Duperre. I am a citizen and resident of the Commonwealth of Massachusetts, and I make this Certification based on personal knowledge and in support of Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction.

2.    I am a Director, Business Development - Franchising for Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' or Dunkin' Donuts") and Baskin-Robbins Franchised Shops LLC ("Baskin-Robbins"). I have been employed by Dunkin' Brands, Inc. since October 2001.

3.    As Director, Business Development - Franchising, my job responsibilities include but are not limited to valuing new and existing Dunkin' and Dunkin'/Baskin-Robbins businesses for the purpose of purchase and/or resale to new or existing franchisees. I am also responsible for the management and oversight of the transfer process of existing restaurants between new and existing franchisees. I have been responsible for finding purchasers for Defendants' shops pursuant to the Purchase Option Agreements ("POAs") signed by the parties since May, 2007.

4.      Plaintiffs timely exercised their option to purchase 15 of the shops and have found purchasers to assign their rights in 13 of those POAs. True and correct copies of the notices informing Defendants that Plaintiffs were exercising their option rights under the POAs are attached hereto as Exhibit A.

5.      Defendants have delayed on multiple occasions closing on the sale of several of the franchised businesses. Specifically, the sale of the Irving Park Road, Barrington Road, and Glen Ellyn Shops had been scheduled for October 23, 2007, the sale of the Willowbrook Shop had been scheduled for October 15, 2007, the sale of the Hinsdale and Hodgkins Shops had been scheduled for October 25, 2007, and the sale of the St. Charles Shop had been scheduled for October 23, 2007. In each instance, Defendants were unable to close on the sale of the shops on the established date. A true and correct copy of the agreed upon schedule for closing each of Defendants' shops is attached hereto as Exhibit B.

6.      Despite the obligation to transfer the franchised businesses free and clear of all liens and encumbrances, Defendants have over ten million dollars in liens against them. Upon information and belief, these liens relate to loans for Defendant Sadruddin's hotel business. Unbeknownst to Plaintiffs, the liens were placed on the businesses at approximately the same time Defendants were negotiating the terms of the Settlement Agreement. A true and correct copy of a summary of the UCC Financing Statements for Defendants is attached hereto as Exhibit C.

7.      Defendants have repeatedly failed to provide a lease for the North Aurora Shop that conforms to the required terms under the Settlement Agreement. After almost two months of asking, on August 26, 2007, Defendants ultimately produced to Plaintiffs a lease that included percentage rent and base rent that was not called for in the Settlement Agreement. A true and

2

correct copy of this version of the North Aurora lease and the transmittal email from Defendants' then counsel is attached hereto as Exhibit D. When Plaintiffs raised this issue, Defendants ultimately revised the lease by deleting the percentage rent terms but including base rent increases that were not called for in the Settlement Agreement. That deficient lease was not provided to Plaintiffs until October 29, 2007. A true and correct copy of his version of the North Aurora lease and the transmittal email from Defendants' counsel is attached hereto as Exhibit E. To date, Defendants have refused to produce a lease for the North Aurora Shop in compliance with the Settlement Agreement and, as a result, Plaintiffs were unable to exercise their option to purchase the shop.

8.    Similarly, on July 12, 2007, Plaintiffs asked for a copy of the lease for the Westmont Shop. A true and correct copy of a July 12, 2007 email from Plaintiffs' counsel, David Worthen, to Defendants' then counsel, Robert Salkowski, that I was blind copied on at the time it was sent, is attached hereto as Exhibit F. Plaintiffs have never received that lease.

9.    Defendants have unreasonably delayed providing landlord contact information. Before the shops can be transferred, the landlords must approve the assignment of the leases to the purchasers. Plaintiffs first asked for this basic information on July 12, 2007. *See* Ex. F. After numerous follow up requests, on August 26, 2007, Defendants produced a list of landlord names without telephone numbers or contact information. A true and correct copy of this version of the landlord information and the transmittal from Defendants' then counsel is attached hereto as Exhibit G. It was not until October 29, 2007 before Defendants provided any of the requested information.

10.    When Plaintiffs asked for tax identification numbers for Defendants Sabeen, Inc., Fatima & Farida, Inc., and Shaker Khanoo, Inc. in order to conduct up to date lien searches,

3

Defendants' response was that they do not have such information. A true and correct copy of my October 29, 2007 email to Michael Boxerman, counsel for Defendants, and his response of later that day are attached hereto as Exhibit H.

11.    Defendants have failed to provide proof that they have procured Bulk Sales Stop Orders from the Illinois Department of Revenue, which is a prerequisite to closing, however, the purchasers for the Geneva and Elgin shops have indicated that the Orders exists for these shops. I did receive an email on November 7, 2007 from counsel for Defendants indicating that the Bulk Sales Stop Orders had just been received but I have not seen any of the Orders.

12.    Defendants delayed for over a month in providing corporate tax returns to the prospective purchasers so that they could evaluate the finances of the businesses prior to purchasing. On July 30, 2007, Defendants sent what purported to be the corporate tax returns for each of the Defendants. However, in reality, it was the same tax return reproduced multiple times.

13.    Defendants have failed to provide Letters of Representation pursuant to the POAs.

14.    Defendants attempted to delay the closing for the St. Charles and Willowbrook shops based on the alleged vacation of their banker.

15.    Until last week, Defendants Royal Crown, Inc. and Khurshid & Zulfiquar, Inc. had been dissolved as corporations for several years. Accordingly, their status prevented closing on the sale of their shops.

4

Nov 08 07 05:10p                                                    p.5

16.    Defendants' postponements of the closings has also had a significant impact on the purchasers of the shops, who have told me that they have hired employees and closed on loans for the purchase of the businesses in anticipation of established closing dates. According to one of the purchasers, Defendants' postponements have cost him thousands of dollars a week in labor costs.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of November, 2007.

Kevin Duperre

5

# EXHIBIT A

October 31, 2007

Sent Via Certified Mail and Federal Express

SABEEN, Inc
191 Ashfield Ct.,
Bloomingdale, IL 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 340391 - 339 South Eastwood Dr, Woodstock, IL 60098

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively "Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:     Bill Bode, Senior Director Business Development – Franchising
        Michael Roderick, Contract Administrator

October 31, 2007

Sent Via Certified Mail and Federal Express

SHAKER-KHANOO, Inc.
191 Ashfield Ct.,
Bloomingdale, IL 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 300211 – 3019 Wolf Rd., Westchester, IL 60153

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively "Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:    Bill Bode, Senior Director Business Development – Franchising
       Michael Roderick, Contract Administrator

September 4, 2007

Sent Via Certified Mail and Federal Express

Navroz, Inc
836 Tallgrass Drive
Bartlett, IL  60103

Re: Exercise of Purchase Option Agreement
Dunkin' Donuts Shop PC # 301359 - Irving Park Rd, Hanover Park, IL 60133

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Dunkin' Donuts Shop.

Very truly yours,

Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:      Bill Bode, Senior Director Business Development – Franchising
         Michael Roderick, Contract Administrator

September 29, 2007

Sent Via Certified Mail and Federal Express

Sankar Rahim, Inc.,
5 N 960 Bakerhill Ct.,
St. Charles, IL 60175

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 301854 – 1711 W. Main St., St. Charles, IL 60174

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins
Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:    Bill Bode, Senior Director Business Development – Franchising
       Michael Roderick, Contract Administrator

September 4, 2007

Sent Via Certified Mail and Federal Express

Khurshid and Zulfiquar, Inc
1823 W. Hood
Unit F
Chicago, IL  60660

Re: Exercise of Purchase Option Agreement
Dunkin' Donuts Shop PC # 301869 - 22 W 251 North Ave, Glen Ellyn, IL 60137

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Dunkin' Donuts Shop.

Very truly yours,

Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:    Bill Bode, Senior Director Business Development – Franchising
       Michael Roderick, Contract Administrator

September 5, 2007

Sent Via Certified Mail and Federal Express

Sardinia, Inc
191 Ashfield
Bloomingdale, IL 60108

Re: Exercise of Purchase Option Agreement
Dunkin' Donuts Shop PC # 306280 - 150 E Ogden Ave, Hinsdale, IL 60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Dunkin' Donuts Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively "Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its option to purchase the above-referenced Dunkin' Donuts Shop.

Very truly yours,

Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:       Bill Bode, Senior Director Business Development – Franchising
          Michael Roderick, Contract Administrator

September 13, 2007

Sent Via Certified Mail and Federal Express

Royal Crown Inc.,
191 Ashfield Ct.,
Bloomingdale, IL 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 306395 – 7247 Kingery Hwy, Willowbrook, IL 60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively "Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:      Bill Bode, Senior Director Business Development – Franchising
         Michael Roderick, Contract Administrator

September 13, 2007

Sent Via Certified Mail and Federal Express

Sunrose, Inc.,
5 N 960 Bakerhill Ct.
St. Charles, IL 60175

Re: Exercise of Purchase Option Agreement
Dunkin' Donuts Shop PC # 307146 – 15 Danada Sq East, Wheaton, IL 60187

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Dunkin' Donuts Shop.

Very truly yours,

Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:      Bill Bode, Senior Director Business Development – Franchising
         Michael Roderick, Contract Administrator

September 29, 2007

Sent Via Certified Mail and Federal Express

Naveed & Farida, Inc.,
191 Ashfield Ct.
Bloomingdale, IL 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 310222 - 263 S. Randall Rd., Elgin, IL, 60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins
Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC), Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:      Bill Bode, Senior Director Business Development – Franchising
         Michael Roderick, Contract Administrator

September 13, 2007

Sent Via Certified Mail and Federal Express

Al-Karim Inc.,
191 Ashfield Ct.,
Bloomingdale, IL 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 310404 – 9400 Joliet Rd., Hodgkins, IL 60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins
Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:　　Bill Bode, Senior Director Business Development – Franchising
　　　　Michael Roderick, Contract Administrator

September 29, 2007

Sent Via Certified Mail and Federal Express

Tejany & Tejany Inc.,
191 Ashfield Ct.
Bloomingdale, IL. 60108

Re: Exercise of Purchase Option Agreement
Dunkin' Donuts Shop PC # 330402 – 2543 W. Algonquin Rd., Algonquin, IL 60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Dunkin' Donuts Shop.

Very truly yours,

Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:      Bill Bode, Senior Director Business Development – Franchising
         Michael Roderick, Contract Administrator

September 29, 2007

Sent Via Certified Mail and Federal Express

Naveed & Farida, Inc.,
191 Ashfield Ct.
Bloomingdale, IL. 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 330933 – 1770 S. Randall Rd, Geneva, IL. 60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins
Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:     Bill Bode, Senior Director Business Development – Franchising
        Michael Roderick, Contract Administrator

October 22, 2007

Sent Via Certified Mail and Federal Express

INARA, Inc.,
191 Ashfield Ct.
Bloomingdale, IL. 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 331015 – 516 West Irving Park Rd, Wood Dale, IL
60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins
Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts
Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively
"Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its
option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:     Bill Bode, Senior Director Business Development – Franchising
        Michael Roderick, Contract Administrator

September 4, 2007

Sent Via Certified Mail and Federal Express

Naveed and Naleena Inc
836 Tallgrass Drive
Bartlett, IL  60103

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 336862 - 7450 Barrington Rd, Hanover Park, IL 60133

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively "Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:      Bill Bode, Senior Director Business Development – Franchising
         Michael Roderick, Contract Administrator

October 31, 2007

Sent Via Certified Mail and Federal Express

Fatima & Farida, Inc.,
191 Ashfield Ct.,
Bloomingdale, IL 60108

Re: Exercise of Purchase Option Agreement
Baskin-Robbins/Dunkin' Donuts Shop PC # 340339 – 15 East Ogden Ave., Westmont, IL 60559

Dear Sir:

Pursuant to the Purchase Option Agreement signed May, 2007, between Baskin-Robbins Franchised Shops LLC (successor in interest to Baskin-Robbins USA LLC) , Dunkin' Donuts Franchised Restaurants LLC (successor in interest to Dunkin Donuts LLC), (collectively "Franchisor") and you, Franchisor for itself or its nominee or assignee, hereby exercises its option to purchase the above-referenced Baskin-Robbins/Dunkin' Donuts Shop.

Very truly yours,

Baskin-Robbins Franchised Shops LLC
Dunkin' Donuts Franchised Restaurants LLC

Kevin Duperre
Director Business Development - Franchising

cc:    Bill Bode, Senior Director Business Development – Franchising
       Michael Roderick, Contract Administrator

# EXHIBIT B

p.1

| PC | Location | Buyer | Closing Dates | Priority |
|---|---|---|---|---|
| 306395 | 7247 Kingery Hwy, Willowbrook, IL 60559,   ROYAL CROWN, INC. | Scott Zalinski | 10/15/2007 | 1 |
| 301854 | 1711 W Main St, Saint Charles, IL 60174,   SANKAR RAHIM, INC. | John Cywinski | 10/23/2007 | 2 |
| 301359 | 1511 IRVING PARK RD, HANOVER PARK, IL 60133,   NAVROZ, INC. | Rishad Ramzanali | 10/23/2007 | 3 |
| 301889 | 22W1251 NORTH AVE, GLEN ELLYN, IL 60137,   KHURSHID & ZULFIQUAR, INC. | Rishad Ramzanali | 10/23/2007 | 3 |
| 386862 | 7460 BARRINGTON RD, HANOVER PARK, IL 60133,   NAVEED & NALEENA, INC. | Rishad Ramzanali | 10/23/2007 | 3 |
| 310404 | 9400 JOLIET RD, HODGKINS, IL 60559,   AL-KARIM, INC. | Manek and Chandrika Patel | 10/25/2007 | 4 |
| 306280 | 150 E Ogden Ave, Hinsdale, IL 60559,   SARDINIA, INC. | Manek and Chandrika Patel | 11/5/2007 | 5 |
| 310222 | 283 S Randall Rd, Elgin, IL 60559,   NAVEED & FARIDA, INC. | John Cywinski | 11/5/2007 | 5 |
| 331015 | 816 W Irving Park Rd, Wood Dale, IL 60559,   INARA, INC. | Amin Habib | 11/15/2007 | 6 |
| 307146 | 15 Danada Sq E, Wheaton, IL 60187,   SUNROSE, INC. | Todd Shaw | 11/15/2007 | 6 |
| 330402 | 2543 W ALGONQUIN RD, ALGONQUIN, IL 60559,   TEJANY & TEJANY, INC | John Cywinski | 11/15/2007 | 6 |
| 330933 | 1770 S Randall Rd, Geneva, IL 60559,   NAVEED & FARIDA, INC. | John Cywinski | 11/15/2007 | 6 |

# EXHIBIT C

LIEN REPORT (11-8-07)

| Debtor | Secured Party | Instrument | Date Filed | Amount/Collateral |
|--------|---------------|-----------|-----------|-------------------|
| PC#310404 Al-Kirim | Premier Bank | UCC-1 | 3/8/04 | all assets |
| PC#340339 Fatima & Farida | Premier Bank | UCC-1 | 3/22/07 | all assets |
| PC#340339 Fatima & Farida | Dunkin' Donuts Midwest Dist. Center | UCC-1 | 8/13/04 | espresso machine |
| PC#340339 Fatima & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#340339 Fatima & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#340339 Fatima & Farida | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#306280 Sardinia | Premier Bank | UCC-1 | 3/31/04 | all assets |
| PC#306280 Sardinia | Premier Bank | UCC-1 | 3/31/04 | all assets |
| PC#306280 Sardinia | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#306280 Sardinia | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#306280 Sardinia | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#307146 Sunrose | Mutual Bank | UCC-1 | 4/26/07 | all assets |
| PC#307146 Sunrose | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#307146 Sunrose | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#307146 Sunrose | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#340391 Sabeen | IRS | Federal Tax Lien | 8/3/07 | $9,422.13 |
| PC#340391 Sabeen | IRS | Federal Tax Lien | 4/4/07 | $14,782.44 |
| PC#340391 Sabeen | West Suburban Bank | UCC-1 | 3/3/05 | PMSI |
| PC#340391 Sabeen | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#340391 Sabeen | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |

| | | | | |
|---|---|---|---|---|
| PC#340391 Sabeen | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#300211 Shaker - Khanoo | West Suburban Bank | UCC-1 / UCC-3 | 11/30/99 / 9/17/01 8/12/04 | all assets |
| PC#300211 Shaker - Khanoo | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#300211 Shaker - Khanoo | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#300211 Shaker - Khanoo | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 2/17/04 | stock in Inara, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 3/8/04 | stock in Al-Karim, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 3/22/04 | stock in Fatima & Farida, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 3/31/04 | stock in Sardina, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 6/25/04 | stock in Naveed & Naleena, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Mutual Bank | UCC-1 | 4/27/07 | stock in: <br> - Tejany & Tejany, Inc. <br> - Ali-Mohammed, Inc. <br> - Fatima & Farida, Inc. <br> - Inara, Inc. <br> - Khurshid & Zulfiquar, Inc. <br> - Naveed & Naleena, Inc. <br> - Naveed & Farida, Inc. <br> - Sabeen, Inc. <br> - Sankar Rahim, Inc. <br> - Sardinia, Inc. <br> - Shaker-Khanoo, Inc. <br> - Sunrose, Inc. <br> - Al-Fatima Inc. |

| | | | - Navroz, Inc.<br>- Ambreen & Meena, Inc.<br>- Naveed & Sunena, Inc. | all assets |
|---|---|---|---|---|
| Al-Fatima | West Suburban Bank | UCC-1 / UCC-3 | 5/28/02, 6/25/02, 4/17/07 | all assets |
| Al-Fatima | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Al-Fatima | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Al-Fatima | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Inara | Premier Bank | UCC-1 | 2/17/04 | all assets |
| Inara | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Inara | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Inara | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Khurshid & Zulfiquar | West Suburban Bank | UCC-1 | 3/24/03 | all assets |
| Khurshid & Zulfiquar | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Khurshid & Zulfiquar | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Khurshid & Zulfiquar | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Naveed & Farida | West Suburban Bank | UCC-1, UCC-3 | 2/22/00, 9/25/01, 1/18/05 | all assets |
| Naveed & Farida | West Suburban Bank | UCC-1, UCC-3 | 2/22/00, 9/25/01, 1/18/05 | all assets |
| Naveed & Farida | West Suburban Bank | UCC-1, UCC-3 | 2/22/00, 9/25/01, 1/18/05 | all assets |
| Naveed & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Naveed & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |

| Naveed & Farida | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
|---|---|---|---|---|
| Naveed & Naleena | Premier Bank | UCC-1 | 6/24/04 | all assets |
| Naveed & Naleena | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Naveed & Naleena | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Naveed & Naleena | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Navroz | Premier Bank | UCC-1 | 3/6/06 | all assets |
| Navroz | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Navroz | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Navroz | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Sankar Rahim | West Suburban Bank | UCC-1 / UCC-3 | 4/26/01, 6/25/02, 11/7/05 | all assets |
| Sankar Rahim | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Sankar Rahim | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Sankar Rahim | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Tejany & Tejany | West Suburban Bank | UCC-1, UCC-3 | 8/21/98, 9/18/01, 3/07/03 | all assets |
| | West Suburban Bank | UCC-1, UCC-3 | 8/21/98, 9/26/01, 3/07/03 | all assets |
| | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |

# EXHIBIT D

LIEN REPORT (11-8-07)

| Debtor | Secured Party | Instrument | Date Filed | Amount/Collateral |
|---|---|---|---|---|
| PC#310404 Al-Kirim | Premier Bank | UCC-1 | 3/8/04 | all assets |
| PC#340339 Fatima & Farida | Premier Bank | UCC-1 | 3/22/07 | all assets |
| PC#340339 Fatima & Farida | Dunkin' Donuts Midwest Dist. Center | UCC-1 | 8/13/04 | espresso machine |
| PC#340339 Fatima & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#340339 Fatima & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#340339 Fatima & Farida | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#306280 Sardinia | Premier Bank | UCC-1 | 3/31/04 | all assets |
| PC#306280 Sardinia | Premier Bank | UCC-1 | 3/31/04 | all assets |
| PC#306280 Sardinia | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#306280 Sardinia | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#306280 Sardinia | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#307146 Sunrose | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#307146 Sunrose | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#307146 Sunrose | West Suburban Bank | UCC-1 / UCC-3 | 4/19/01 / 11/07/05 | all assets |
| PC#307146 Sunrose | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#340391 Sabeen | IRS | Federal Tax Lien | 8/3/07 | $9,422.13 |
| PC#340391 Sabeen | IRS | Federal Tax Lien | 4/4/07 | $14,782.44 |
| PC#340391 Sabeen | West Suburban Bank | UCC-1 | 3/3/05 | PMSI |
| PC#340391 Sabeen | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| PC#340391 Sabeen | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |

| Debtor | Secured Party | UCC | Date | Collateral |
|---|---|---|---|---|
| PC#340391 Sabeen | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| PC#300211 Shaker - Khanoo | West Suburban Bank | UCC-1 / UCC-3 | 11/30/99 / 9/17/01 | all assets |
| PC#300211 Shaker - Khanoo | Mutual Bank | UCC-1 | 8/12/04 | all assets – for loan in amount of $12,410,256 |
| PC#300211 Shaker - Khanoo | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| PC#300211 Shaker - Khanoo | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $900,000 |
| PC#300211 Shaker - Khanoo | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 2/17/04 | stock in Inara, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 3/8/04 | stock in Al-Karim, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 3/22/04 | stock in Fatima & Farida, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 3/31/04 | stock in Sardina, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Premier Bank | UCC-1 | 6/25/04 | stock in Naveed & Naleena, Inc. |
| Noorudin Sadruddin (Noorudin Tejany) | Mutual Bank | UCC-1 | 4/27/07 | stock in<br>- Tejany & Tejany, Inc.<br>- Ali-Mohammed, Inc.<br>- Fatima & Farida, Inc.<br>- Inara, Inc.<br>- Khurshid & Zulfiquar, Inc.<br>- Naveed & Naleena, Inc.<br>- Naveed & Farida, Inc.<br>- Sabeen, Inc.<br>- Sankar Rahim, Inc.<br>- Sardinia, Inc.<br>- Shaker-Khanoo, Inc.<br>- Sunrose, Inc.<br>- Al-Fatima Inc. |

| | | | | - Navroz, Inc.<br>- Ambreen & Meena, Inc.<br>- Naveed & Sunena, Inc. |
|---|---|---|---|---|
| Al-Fatima | West Suburban Bank | UCC-1 / UCC-3 | 5/28/02, 6/25/02, 4/17/07 | all assets |
| Al-Fatima | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Al-Fatima | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Al-Fatima | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Inara | Premier Bank | UCC-1 | 2/17/04 | all assets |
| Inara | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Inara | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Inara | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Khurshid & Zulfiquar | West Suburban Bank | UCC-1 | 3/24/03 | all assets |
| Khurshid & Zulfiquar | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Khurshid & Zulfiquar | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Khurshid & Zulfiquar | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Naveed & Farida | West Suburban Bank | UCC-1, UCC-3 | 2/22/00, 9/25/01, 1/18/05 | all assets |
| Naveed & Farida | West Suburban Bank | UCC-1, UCC-3 | 2/22/00, 9/25/01, 1/18/05 | all assets |
| Naveed & Farida | West Suburban Bank | UCC-1, UCC-3 | 2/22/00, 9/25/01, 1/18/05 | all assets |
| Naveed & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Naveed & Farida | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |

| Name | Bank | UCC | Date | Description |
|---|---|---|---|---|
| Naveed & Farida | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Naveed & Naleena | Premier Bank | UCC-1 | 6/24/04 | all assets |
| Naveed & Naleena | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Naveed & Naleena | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Naveed & Naleena | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Navroz | Premier Bank | UCC-1 | 3/6/06 | all assets |
| Navroz | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Navroz | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Navroz | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Sankar Rahim | West Suburban Bank | UCC-1 / UCC-3 | 4/26/01,  6/25/02, 11/7/05 | all assets |
| Sankar Rahim | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| Sankar Rahim | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| Sankar Rahim | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |
| Tejany & Tejany | West Suburban Bank | UCC-1, UCC-3 | 8/21/98, 9/18/01, 3/07/03 ; 8/21/98, 9/26/01, 3/07/03 | all assets |
| | West Suburban Bank | UCC-1 | 4/26/07 | all assets |
| | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $12,410,256 |
| | Mutual Bank | UCC-1 | 4/26/07 | all assets – for loan in amount of $10,400,000 |
| | Mutual Bank | UCC-1 | 4/27/07 | all assets – for loan in amount of $900,000 |

# EXHIBIT E

## Worthen David E

| | |
|---|---|
| **From:** | Kevin.Duperre@dunkinbrands.com |
| **Sent:** | Tuesday, October 30, 2007 11:11 AM |
| **To:** | Michael Boxerman; Worthen David E |
| **Cc:** | Ira Marcus; Seamus Ryan |
| **Subject:** | Re: FW: FW: Sadruddin - North Aurora |

Michael the terms in the attached don't reflect the terms called out in the Himani contract. Specfically the issue relates to the proposed 3% annual increases. The Himani contract had no proposed increases called out _ it was a straight 10k/month with 2 5 year options. Based on this difference I would submit either the terms are changed to reflect this, or the terms and lease provided are unacceptable. I can be available after 3PM EST and will call to discuss. Kevin

----- Original Message -----
From: "Michael Boxerman" [mboxerman@mbclegal.com]
Sent: 10/29/2007 02:08 PM EST
To: "Worthen David E" <David.Worthen@gpmlaw.com>; Kevin Duperre
Cc: "Ira Marcus" <IraMarcus@mbclegal.com>; "Seamus Ryan" <sryan@mbclegal.com>
Subject: FW: FW: FW: Sadruddin - North Aurora

Gentlemen,

I am forwarding a North Aurora Lease I received from Noor. I have not yet reviewed it.

Michael Boxerman

**From:** noor@serenagroup.com [mailto:noor@serenagroup.com]
**Sent:** Monday, October 29, 2007 1:11 PM
**To:** Michael Boxerman
**Cc:** Ira Marcus; Seamus Ryan
**Subject:** RE: FW: FW: Sadruddin - North Aurora

I have attached the revsed lease as per Dunkin requirements. Please forward it to Kevin Duperre and David Worthen. Thanks.

*******************************************************
This e-mail message, including any attachments, is for the sole use of the addressee

# LEASE OF DUNKIN' DONUTS SHOP

## PARTIES

1. This LEASE dated May 1, 2007, is made by and between Farida Sadruddin of 191 Ashfield Court, Bloomingdale, IL 60108 (full address)having its principal office in <u>Illinois</u> (state), (the "LESSOR"), and Al-Fatima Inc. of 407 S. Lincolnway, North Aurora, IL 60542 (full address) a corporation having its principal office in <u>Illinois</u> (state) (the "LESSEE")

## PREMISES

2. The LESSOR hereby LEASEs to the LESSEE and the LESSEE hereby LEASEs from the LESSOR the property and the DUNKIN' DONUTS SHOP thereon located at <u>407 S Lincolnway, North Aurora, IL 60542</u> (full address) as more fully described in Schedule A hereto (the "PREMISES").

3. Commencing from May 1st, 2007 and continuing through the term of the Lease, the Lessee agrees to pay a yearly base rent. The base rent from the commencement date of the lease through July 31st, 2008 shall be at $120,000.00 per year and payable in equal monthly installments of $10,000.00. The base rent shall be payable in said monthly installments in advance of the first day of each month immediately proceeding the month of which rental payments are due. Base rent shall be paid in equally monthly installments due on the 1st day of each month for the month in which rentals are due.

   The base rental shall increase commencing August 1st, 2008 through the end of the initial lease term pursuant to the schedule as set forth on Schedule A, attached hereto and incorporated into the terms of this lease.

4. DEPOSIT. Lessee, concurrently with the execution of this Lease, has deposited with Lessor the sum of Twenty Thousand Dollars ($20,000.00) (Two Months rents) (to be increased in the event the option is exercised to at all times maintain a balance of security deposit equal too two (2) times the currently monthly rent which sum shall be held by Lessor as security for the full and prompt performance of each and every obligation, covenant and agreement of Lessee in this Lease, including Lessee's obligations upon termination of this Lease or termination of Lessee's right to possession. The Deposit (which shall not bear interest to Lessee), may, but need not, be applied to Lessor in order to cure any Default in any of the terms, provisions, or conditions of this Lease. The Deposit shall be returned to Lessee by the Lessor, after deducting there from any sums owed to Lessor pursuant to provisions of this Lease, upon Lessee successfully performing each and every obligation, covenant and agreement required by Lessee to be performed hereunder. Should the Demised Premises be conveyed, or Lessor's interest be assigned, the Deposit (or any portion thereof not previously applied) may be turned over or credited to Lessor's grantee or assignee as applicable, and if the same be turned over or credited as aforesaid, Lessee hereby releases Lessor from any and all liability with respect to the Deposit or its application or return and Lessee agrees to look solely to such grantee or assignee for such application or return. In the event Lessor applies the Deposit in whole or in part against a

1

Default by Lessee, Lessee shall, upon demand by Lessor, deposit sufficient funds to maintain the Deposit in the initial amount. Failure of Lessee to deposit additional funds as security shall constitute a default hereunder, and entitle the Lessor to avail itself of the remedies provided in this Lease *for* non-payment of Rent by Lessee. Except as provided by law, neither Lessor, nor its respective successors shall be obligated to hold the Deposit in a separate fund, and Lessor may commingle the same with other funds. Lessor shall refund to Lessee any Deposit in Lessor's possession which relates to Lessee's occupancy of its current premises (the "Current Premises") to the extent Lessee is not in default in connection with its occupancy of such Premises at the termination of this Lease, subject to all applicable conditions and terms of hits Lease.

5.  LATE CHARGE.  In the event any sums required hereunder to be paid are *not* received on or before the Tenth (10th) calendar day after the same are due, then, Lessee shall immediately pay, as Additional Rent, a late payment service charge of five percent (5%) of the total monthly rental amount due. Notwithstanding this late payment service charge, Lessee shall be in Default under this Lease if any payments (Rent or Additional Rent) required to be made by Lessee are *not* made at *or* before the times herein stipulated. In addition, any amount due hereunder shall bear interest from the date due until said past due amount shall be paid by Lessee to Lessor at a rate equal to five percent (5%) above the Prime Rate as announced by the Bank One of Chicago, Illinois (or its successor) from time to time, which rate shall change when and as said prime rate changes but which rate shall not be in excess of any maximum interest rate permitted by law.

## DEFINITIONS

6.

   a.  The term "GROSS SALES", as used herein, shall include all sales made by the LESSEE in, on, or from  the PREMISES, including but not limited to all related wholesale and production sales of all Dunkin Donuts/Baskin Robbins products sold from the leased premises, but shall not include cigarette sales, sales taxes or similar taxes.

   b.  The term "LEASE YEAR", as used herein, shall refer to successive periods of 52 consecutive weeks commencing on the first Sunday the DUNKIN' DONUTS SHOP is open to serve the general public, or on the next succeeding business day if the DUNKIN' DONUTS SHOP is not open on Sunday.

   c.  The term "LEASE MONTH", as used herein, shall mean the period beginning on the Sunday immediately following the last Saturday of any calendar month and ending on the last Saturday of the next calendar month.

7.

## TERM AND COMMENCEMENT OF RENT

8.  This LEASE is for the term commencing on May 1, 2007 and ending on July 31, 2012; and LESSEE's obligation to pay the rentals provided above shall commence and end on such dates; provided, however, that there shall be no obligation to pay the rentals until the substantial completion of the Dunkin' Donuts Shop and delivery of the PREMISES to the LESSEE.

9.

a. In addition to the rentals provided above, the LESSEE agrees to pay, before interest and penalties accrue, all real estate taxes and other taxes, including special assessments for betterments, which may be imposed on or become due and payable with respect to the PREMISES during the term. During the first and last years of the term the LESSEE shall pay a prorate share of all such taxes; said share shall be apportioned over the term of the period for which the taxes are assessed to include only those taxes applicable to the term of the LEASE. The LESSEE may, at its own expense, and in the name of either or both the LESSOR or the LESSEE, initiate and prosecute proceedings for an abatement or review of any tax and the LESSOR agrees to cooperate with the LESSEE in any such proceedings.

b. The LESSEE agrees to deposit with the LESSOR each month one-twelfth (1/12) of the estimated yearly real estate taxes due and payable on the PREMISES. For purposes of this LEASE, the estimated yearly real estate tax on the PREMISES shall be assumed to be the amount of tax levied in the most current tax year of the taxing authorities concerned unless LESSOR determines that an alternative estimated yearly real estate tax is more reasonable. During the period from commencement of rent until the end of the first tax year, the LESSEE will make monthly tax payment deposits of Two Thousand and Thirty Five Dollars ($2,035.00). All such monthly tax payments shall be due and payable at the same time as the rental payments required under Paragraph 3 above. Upon the payment of any real estate or other tax bill, if LESSOR determines that there is a deficiency in the balance of deposits held on account of future tax liabilities, LESSEE shall pay to LESSOR, within twenty (20) days after billing, the amount of such deficiency, as determined by LESSOR.

## PURPOSE AND USE

10. It is agreed that the LESSEE may use the PREMISES only for the operation of DUNKIN' DONUTS SHOP for the manufacture and sale on and off the PREMISES, at wholesale or retail, of all items approved by DUNKIN BRANDS. The LESSEE shall use the PREMISES for no other purpose.

## LESSOR'S WARRANTIES

11. The LESSOR warrants that the LESSOR controls the PREMISES, either by ownership or LEASE, or both, and that the LESSOR has full legal right to enter into this LEASE.

## LESSER'S COVENANTS

12. The LESSER agrees:

   a. To assign to the LESSEE all warranties and guarantees obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the PREMISES and to use reasonable diligence in assisting the LESSEE in the enforcement of such warranties and guarantees; and

   b. Not to disturb the LESSEE's possession and quiet enjoyment of the PREMISES so long as the LESSEE is not in default under this LEASE.

LESSEE'S COVENANTS

13. The LESSEE agrees:

    a. To pay, when due, rent and all charges for water, gas, electricity and other utilities furnished to the PREMISES;

    b. To pay any and all taxes pertaining to and levied upon the PREMISES and the LESSEE's property located on the PREMISES;

    c. Prior to entry upon the PREMISES, to procure and maintain in full force and effect for the PREMISES and the LESSOR and their directors and employees against any loss, liability or expense whatsoever from (without limitation) fire, personal injury, theft, death, property damage, or otherwise arising or occurring upon or in connection with the PREMISES or by reason of the LESSEE's operation or occupancy of the PREMISES. Such policy or policies shall include comprehensive general liability insurance, including, but not limited to, product and contractual liability coverage, with a single limit of Two million dollars ($2,000,000) or such higher limit as LESSOR, in its sole and absolute discretion, may from time to time require, for bodily injury and property damage combined, all risk property damage insurance, including flood and earthquake protection, for the full replacement cost value of the PREMISES, plate glass insurance and boiler insurance, if applicable, and such statutory insurance as may be required in the state in which the DUNKIN' DONUTS SHOP is located. All insurance afforded by the policies required under the terms of the Paragraph shall:

        i. Be written in the names of the LESSEE, the LESSOR and any other party directed by the LESSOR, as their respective interests may appear;

        ii. Be written by insurance companies acceptable to the LESSOR;

        iii. Contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;

        iv. Contain the provision that cancellation or alternation cannot be made without at least thirty (30) days written notice to any party named; and

        v. Not be limited in any way by reason of any insurance which may be maintained by the LESSOR;

        vi. Contain a standard mortgagee clause naming the holder of any mortgage, deed of trust or any other security agreement as a named insured.

During the term of the LEASE, the LESSEE shall furnish the LESSOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that the premiums thereof have been paid. If at any time during the term the LESSEE fails to comply with the provisions of this Paragraph 12(c), the LESSOR, in addition to all other remedies available, may elect to obtain such insurance and keep the same in effect and the LESSEE shall pay the LESSOR, as additional rent upon demand, the cost of premiums thereof.

d.   To comply promptly with all applicable laws, rules, regulations, ordinances, requirements and orders of public authorities, the Board of Fire Underwriters and similar organizations;

e.   To save the LESSOR and any other party claiming an interest in the PREMISES harmless and indemnified from and against any and all injury, loss, claim or damage or liability to any person or property while on the PREMISES;

f.   To keep the PREMISES and all pipes, wires, glass, plumbing, and other equipment therein or used therewith repaired and of the same kind of quality and description and in such good repair, order and condition as the same are at the beginning of, or may be put in, during the term of this LEASE, except for reasonable wear and use and damage by fire or unavoidable casualty;

g.   To make no material alteration, addition, replacement or improvement in, or to, the interior or exterior of the DUNKIN' DONUTS SHOP without prior written consent of the LESSOR;

h.   To keep full, complete and accurate books and accounts in accordance with generally accepted accounting principles and in the form and manner as may be prescribed by the LESSOR from time to time to allow and facilitate the LESSOR's substantiation of the LESSEE'S GROSS SALES and to allow access to the LESSOR or representatives of the LESSOR to such books and accounts;

i.   To continuously operate the DUNKIN' DONUTS SHOP on the PREMISES, fully stocked and staffed, so as to maximize the amount of GROSS SALES;

j.   To give written notice of any default of the LESSOR's covenants or obligations under the terms of this LEASE to any mortgagee or assignee (conditional or otherwise) of any interest, or holder of any security interest, in any portion of the LEASE or the PREMISES (whether derived from the LESSOR or from any parent, affiliate or assignee of the LESSOR) of which the LESSEE has notice, and if such default would allow the LESSEE to cancel or terminate this LEASE, give written notice of any intended cancellation or termination to any such mortgagee, assignee, or holder and allow such mortgagee, assignee, or holder 30 days to cure the default or undertake in writing to perform all of the covenants of the LESSOR under the terms of this LEASE, in either of which event the LEASE is to continue in full force and effect; and

k.   To remove, at the expiration of the term, the LESSEE's goods and effects and to peaceable yield up the PREMISES in as good repair and condition as the same may be in at the commencement of the term or may be put in thereafter except for reasonable wear and use.

## SUBORDINATION

14. This LEASE shall be subject and subordinate to any mortgage, deed of trust, sale, sale and leaseback, or any other security arrangement or interest made with or given to any bank, insurance company, finance company, other lender or purchaser covering the PREMISES; provided, however, that such subordination will not disturb the LESSEE's possession and quiet enjoyment of the PREMISES so long as the LESSEE is not in default under this LEASE. The LESSEE

5

does hereby designate the LESSOR as its agent to execute any document necessary to complete such subordination. In the event the interest of the LESSOR in the PREMISES shall be transferred to and owned by any other person (i) by reason of a foreclosure or other proceedings brought in respect to any mortgage, deed of trust or security instrument affecting the PREMISES, (ii) by a deed in lieu of foreclosure, or (iii) by any other manner, LESSEE shall agree to recognize such other person under all of the terms, covenants, and conditions of this LEASE, and LESSEE hereby agrees that any person which the LESSEE agrees to recognize as its Lessor hereunder shall not be liable for any action or omission of any prior Lessor including the LESSOR nor shall such person be subject to any offsets or defense which the LESSEE may have against any prior Lessor, including the LESSOR. LESSOR and LESSEE hereby agree for the benefit of any mortgagee that may hereafter have an interest in the PREMISES that the rent payable hereunder by the LESSEE shall not be paid for more than sixty (60) days in advance and no amendment of the LEASE or waiver or modification of the terms of the LEASE shall become effective without the prior written consent of the mortgagee, provided that such consent is required under the indenture of mortgage.

15.

    a. The LESSEE hereby agrees that the LESSOR is not to be held responsible or liable in any manner whatsoever for any latent construction or other material defects in the PREMISES and that the rent payable hereunder shall not be diminished or abated by reason thereof. In the event the LESSEE shall hereafter contend that he PREMISES require repair or replacement of any nature or kind whatsoever, then the LESSEE shall exert any claim thereof directly against the contractor or contractors of the LESSOR or any other LESSOR of the PREMISES, without in any manner asserting any claim against the LESSOR. In the event of any claim or claims against the said contractor or contractors, the LESSOR agrees to cooperate with the LESSEE in advancing and furthering the LESSEE's claim against said contractor or contractors at LESSEE's cost and expense. The LESSEE agrees to reimburse the LESSOR for any expenses or cost to which the LESSOR shall have been put in so cooperating with the LESSEE. The LESSEE also agrees that the LESSOR is not liable or responsible in any manner whatsoever for delays in the completion of the construction or repairs of the PREMISES;

    b. Each party doing any construction, maintenance or repair work shall promptly discharge or bond any obligations or liens arising there from; and

    c. Upon the request of either party, the other party shall execute, acknowledge and deliver appropriate recordable instruments giving notice of this LEASE and the commencement date of the LEASE under Paragraph 7 hereof and any other documents which may be required to facilitate any financing of the PREMISES.

16.

    a. The LESSEE warrants that a Franchise Agreement between the LESSEE and DUNKIN' BRANDS INCORPORATED, to operate the DUNKIN' DONUTS SHOP is in full force and effect and that this LEASE is subject to said Franchise Agreement remaining in full force and effect. If said Franchise Agreement is terminated for any reason then the LESSOR shall have the right to terminate this LEASE.

6

    b.  The LESSOR's representatives shall have the right to inspect the PREMISES at all times.

## ASSIGNMENT OR SUBLETTING

17.

    a.  LESSOR may assign any interest in this LEASE at any time, provided that no such assignment will reduce the obligations of the LESSOR or disturb the LESSEE's possession and quiet enjoyment of the PREMISES so long as the LESSEE is not in default under this LEASE or under the provisions of any notification received by the LESSEE from the Assignee of this LEASE;

    b.  Upon any permitted assignment of this LEASE, LESSEE shall remain liable throughout the balance of the term for the payment of rent and other charges and for the performance of all terms, covenants and conditions herein undertaken by the LESSEE.

    c.  Lessee shall not, without the express written consent of Lessor, (such consent shall be at the sole discretion of Lessor): (i) assign or otherwise transfer, mortgage or encumber this Lease or any of its rights hereunder, (ii) sublet the Demised Premises or any part thereof or permit the use of the Demised Premises or any part thereof by any persons other than Lessee or its agents, or (iii) permit the assignment or other transfer of this Lease or any of Lessee's rights hereunder by operation of law. Any attempted or purported transfer, assignment, mortgaging or encumbering of this Lease or any of Lessee's interest hereunder, and any attempted or purported subletting or grant of a right to use or occupy all or a portion of the Demised Premises, in violation of the foregoing sentence shall be null and void and shall not confer any rights upon any purported transferee, assignee, mortgagee, sub Lessee, or occupant.

    d.  (b) Any costs and expenses, including attorneys' fees (which shall include the cost of any time expended by any counsel of Lessor) incurred by Lessor in connection with the review of any proposed or purported assignment, transfer or sublease shall be borne by Lessee and shall be payable to Lessor, on demand, as Additional Rent; provided, however, such sum shall not exceed Fifteen Hundred Dollars ($1,500.00).

    e.  If LESSEE is a corporation, the transfer of a majority of the issued and outstanding capital stock of such corporation, or if LESSEE is a partnership, the transfer of a majority of the total interest in such partnership, however accomplished, and whether in a single transaction or in a series of related or unrelated transactions, shall be deemed an assignment of this LEASE.

    f.  The LESSOR will not unreasonably withhold or delay consent to the assignment of the lease as long as Dunkin Brand approves the assignee.

## FIRE AND CASUALTY

18. The LESSOR agrees with the LESSEE that if the PREMISES or any part hereof shall be damaged by fire of casualty, the LESSOR will proceed with reasonable dispatch, after receipt of the insurance proceeds resulting from the fire or casualty, to restore the PREMISES to substantially the same condition as prior to the damage, it being understood and agreed that if the cost of the restoration exceeds the amount of the insurance money, the LESSEE will pay the LESSOR for

such additional cost prior to restoration. The LESSEE agrees that there shall be no abatement in rent pending restoration of the PREMISES and that the LESSEE during the term of this LEASE shall keep in full force and effect adequate "Business interruption insurance" insuring the operation of the DUNKIN' DONUTS SHOP against loss or damage by fire or casualty. If the PREMISES are damaged by fire or casualty during the last three (3) years of the term of this LEASE and such damage exceeds fifty percent (50%) of the full insurable value of the PREMISES, the LESSOR may elect, by notice to the LESSEE within sixty (60) days of occurence of the damage, not to restore the PREMISES and may terminate this LEASE.

19. In case the PREMISES or any part thereof shall be taken by the exercise of the right of eminent domain, then the LESSEE shall have the option to terminate this LEASE, provided that taking is of such character as to seriously prevent the LESSEE from conducting the LESSEE's business as theretofore and provided said election shall be made within sixty (60) days of said taking. It is further agreed that each party shall be entitled to receive out of any award payment for the amount of damages sustained by it, to its equipment and signs. LESSEE hereby assigns to LESSOR all of it's right, title, and interest in and to any condemnation award payable to LESSEE by the condemning authority as damages for the complete or partial taking of the estate vested in LESSEE by this LEASE. All other damages arising out of a complete or partial taking of the PREMISES which are sustained by LESSEE and to which LESSEE is legally entitled including, without limitation, moving expenses and damages for dislocation of LESSEE's business, shall be paid to LESSEE.

## DEFAULT AND TERMINATION

20.

    a. In the event that the LESSEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by the LESSEE, or such a petition is filed against and consented to by the LESSEE, or is not dismissed within thirty (30) days, or if the LESSEE is adjudicated a bankrupt, and if a bill in equity or other proceedings for the appointment of a receiver of the LESSEE or other custodian for the LESSEE's business or assets is filed and consented to by the LESSEE and is not dismissed within thirty (30) days, or a receiver or other custodian is appointed or if proceedings for composition with creditors under any state or federal law should be instituted by or against the LESSEE, or if the real or personal property of the LESSEE shall be sold after levy thereupon by any sheriff, marshal, or constable, then upon the occurrence of any of said events, the LESSEE shall be deemed to be in default under this LEASE and all rights granted to the LESSEE hereunder shall thereupon terminate without any need for notice to the LESSEE and this LEASE shall thereupon be terminated.

    b. The LESSEE shall be in default under this LEASE:

        i. If the LESSEE fails, refuses or neglects to pay promptly to the LESSOR any monies owing to the LESSOR on the date such payment is due;

        ii. If the LESSEE fails to submit when due reports or financial data which the LESSOR requires under this LEASE; or

      iii. If the LESSEE fails to carry out in all respects any other of the LESSEE's obligations and agreements under this LEASE, or under any equipment agreement, promissory note, conditional sales contract, or other contract materially affecting the DUNKIN' DONUTS SHOP to which the LESSEE is a party or by which the LESSEE is bound.

c. If the LESSEE fails to pay to LESSOR when due any payments required under this LEASE, the LESSEE agrees to pay all collection costs, reasonable attorneys' fees and interest on the unpaid amounts at 18% per annum or the highest permissible rate, in addition to the unpaid amounts.

d. If the LESSEE shall be in default under Paragraph 20(b)(i) of this LEASE and such default shall not be cured within ten (10) days after receipt of a written Notice to Cure thereof from the LESSOR, then, in addition to all other remedies at law or in equity, the LESSOR may immediately terminate this LEASE. In the event of any other default by LESSEE under the terms of this LEASE, and such default shall not be cured within thirty (30) days after receipt of written Notice to Cure thereof from the LESSOR, then, in addition to all other remedies at law or in equity, the LESSOR may immediately terminate this LEASE. If the LESSOR has given to the LESSEE two separate notices because of two distinct defaults in the case of nonpayment of BASE RENT or PERCENTAGE RENT in any LEASE YEAR, LESSOR may upon 30 day written notice to LESSEE may terminate this LEASE. Termination of this LEASE hereunder shall become effective 30 days after date of receipt of written Notice of Termination by the LESSEE.

e. Upon any termination of this LEASE, the LESSOR may enter upon the PREMISES and repossess the same, and expel the LESSEE and those claiming under it, without being guilty of any manner of trespass, and without prejudice to any remedies which might otherwise be used for the event of default in question. In the case of any such termination, the LESSEE will indemnify the LESSOR against all loss or damage suffered by reason of the termination, including loss of rentals which would have otherwise been payable hereunder for the balance of the term had such termination not occurred; and

f. No right or remedy herein conferred upon the LESSOR is exclusive of any other right or remedy herein or by law or equity provided or permitted; but each shall be cumulative of every other right or remedy given hereunder.

## SECURITY INTEREST

21. As security for the faithful performance of all the LESSEE's obligations under this LEASE, the LESSEE hereby grants to the LESSOR a lien upon all property of the LESSEE now or hereafter located upon the PREMISES. If the LESSEE abandons or vacates the PREMISES or any substantial portion thereof or has failed to timely cure any default in the payment of any rentals, damage or other payments required by this LEASE, the LESSOR may enter upon the PREMISES, by force if necessary, and take possession of all or any part of the LESSEE's property, moveable or immoveable, and may sell all or any part of such property at a public or private sale or successive sales, without notice if permitted by law, to the highest bidder for cash, and may convey and deliver, on behalf of the LESSEE, all of the LESSEE's title and interest in the property

sold to the highest bidder. The proceeds of the sale of the property shall be applied by the LESSOR toward the cost of the sale and then toward the payment of all sums then due by the LESSEE to the LESSOR under the terms of this LEASE. In order to permit the LESSEE to finance the purchase of equipment to be placed upon the PREMISES, the LESSOR hereby subordinates any and all its rights pursuant to the lien herein granted by LESSEE, to the lien granted by the LESSEE to any third party in connection with the original purchase of equipment, at the time such equipment is first placed upon the PREMISES during the term of this LEASE.

## PROVISION FOR RENTAL AND NOTICE SUBMISSION

22. All rental payments are to be made to the LESSOR at 191 Ashfield Court, Bloomingdale, IL 60108 (full address) Attn: Farida Sadruddin and any other notice required to be given to the LESSOR shall be sent by certified mail to the LESSOR at 191 Ashfield Court, Bloomingdale, IL 60108 Attn: Farida Sadruddin or at such other address as the LESSOR may from time to time designate in writing to the LESSEE by certified mail. Any notice required to be given to the LESSEE shall be sent by mail to the LESSEE at the address set forth in Paragraph 2 above or at such other address as the LESSEE may from time to time designate in writing to the LESSOR by certified mail.

## WAIVERS

23. One or more waivers of any covenant, condition or agreement herein contained shall not be construed as a waiver of a further breach of the same covenant, condition or agreement or of any other covenant, condition, or agreement, and the consent or approval by the LESSOR to or of any act by the LESSEE requiring the LESSOR's consent or approval shall not be deemed to waive or render unnecessary the LESSOR's consent or approval to any subsequent similar act by the LESSEE. The receipt by LESSOR of rental or other payments with knowledge of the breach by LESSEE of any covenant of this LEASE shall not be deemed a waiver of such breach. Except as expressly set forth in this LEASE, neither party shall be liable to the other party, or to any insurance company (by way of subrogation or otherwise) insuring the other party, for any loss or damage to any building, structure or other tangible property, or losses under worker's compensation laws or benefits, even though such loss or damage might have been caused by the negligence of such party, its agents or employees. Each party does hereby waive trial by jury in any action, proceeding, or counterclaim arising out of or connected in any way with this LEASE or the LESSEE's occupation of the PREMISES. LESSEE, for itself and on behalf of all parties claiming by, through or under LESSEE, to the fullest extent permitted by law, does hereby waive and surrender all rights of redemption, re-entry and/or repossession of the PREMISES under any present or future laws.

## MISCELLANEOUS

24.

    a. All covenants, agreements, conditions and undertakings contained in this LEASE shall extend to and be binding upon the legal representatives, successors, and assigns of the respective parties hereto.

b.  This LEASE shall be void and of no effect if the LESSOR shall be unable to obtain the necessary permits, licenses, and approvals from all public authorities for construction and development of the PREMISES in accordance with the plot plan and plans and specifications developed for the PREMISES. In said event, any monies deposited by the LESSEE shall be immediately returned by LESSOR and the parties shall be relieved of all their obligations hereunder.

c.  Noting contained in this LEASE shall render the LESSOR in any way a partner, joint venture or associate with the LESSEE in the operation of the PREMISES or subject the LESSOR to any obligations, loss, charge, or expense in connection with or arising from the operation of the PREMISES. Notice is hereby given to all whom it may concern of the foregoing.

25.  LESSEE'S WARRANTIES AND OBLIGATIONS. Lessee warrants, represents, covenants and agrees to and with Lessor, that throughout the term hereof it shall: (i) keep the Demised Premises, including the fixtures, displays, show windows, floors, signs and any platform or loading dock used by Lessee clean, neat, sanitary and safe and in good order, repair and condition (including all necessary replacements, painting and decorating), and shall keep all glass in doors, windows and elsewhere clean and in good condition and shall replace promptly all glass which may become damaged or broken with glass of the same quality, ordinary wear and tear and damage by fire or other casualty covered by collectible proceeds of Lessor's insurance excepted; (ii) pay, before delinquent, any and all taxes, assessments and public charges imposed upon Lessee's business or fixtures, and pay when due all fees of similar nature, (iii) comply, and cause all of Ten ant's employees, agents, concessionaires, licensees and invitees to comply with all of the rules and regulations of the Demised Premises ("Rules and Regulations") as adopted in writing from time to time by Lessor; provided, Lessor shall have no duty or obligation to enforce any of the Rules and Regulations or the terms, covenants or conditions and Lessor shall not be liable to Lessee, Lessee's agents or employees, or anyone claiming through Lessee, its agents or employees for violation of any of the Rules and Regulations or any term, covenant or condition of any lease by anyone or any entity; (iv) observe all restrictive covenants of record which are applicable to the Demised Premises; (v) not use the parking areas or sidewalks or any space outside the Demised Premises for display, sale, storage, or any other similar undertaking, (vi) not use any advertising medium or sound devices inside the Demised Premises which may be heard outside the Demised Premises, or permit any objectionable odors to emanate from the Demised Premises; (vii) keep the Demised Premises sufficiently heated to prevent freezing of water in pipes and fixtures in and about the Demised Premises; (viii) keep the temperature within the Demised Premises at such levels as may be required by any federal, state or local laws, ordinances, or regulations, (ix) comply and require all of Lessee's employees, agents, concessionaires, licensees and invitees to comply with all laws, ordinances, orders and governmental regulations, and with the directions of any public officer authorized by law, with respect to the Demised Premises and the use and occupancy thereof; (x) operate its business in the Demised Premises under Lessee's trade name, and under no other name without the prior written approval of Lessor, conduct its business at all times in a businesslike and reputable manner so as to help establish and maintain a good reputation for the Demised Premises, (xi) except when and to the extent that the Demised Premises are unLeasable by reason of damage by fire or other casualty, use and continuously operate a Dunkin Donuts business in the Demised

11

Premises other than such minor portions thereof as are reasonably required for storage and office purposes, use such storage and office space only in connection with the business conducted by Lessee in the Demised Premises, and furnish, install and maintain all fixtures which shall at all times be suitable and proper for carrying on Lessee's business; (xii) install and maintain such fire protection devices as may be required by any governmental body or insurance underwriter for the Demised Premises (except for any fire protection devices required to be installed by Lessor as part of Lessor's Work, if any); (xiii) provide trash storage (only at locations approved by Lessor) and removal services except that if Lessor, in its sole discretion, shall provide trash services, Lessee shall be obligated to use and pay for the same within ten (10) days of due date and contract for regularly scheduled extermination service at such times and with such contractors as Lessor shall approve in writing; (xvi) prevent from existing within the Demised Premises any amusement devises, including pinball machines, video games or any similar item; (xvii) refrain from engaging in any conduct or activity which allows any chemical or vapor which is harmful to persons or property to be emitted from the Demised Premises; and (xviii) employ only such labor in the performance of any work in and about the Demised Premises as will not cause any conflict or controversy with any labor organization representing trades performing work for Lessor, its contractors or subcontractors.

26.  OPTION TO RENEW

Lessee shall at its own expense, comply with all laws, orders, ordinances and with directions of public officers there under, with all applicable Board of Fire Insurance Underwriters regulations and other requirements and with all notices from Lessor's mortgagee respecting all matters of occupancy, condition or maintenance of the Demised Premises, whether such orders or directions shall be directed to Lessee or Lessor, and Lessee shall hold Lessor harmless from any and all costs or expenses on account thereof. Lessee shall procure and maintain all licenses and permits legally necessary for the operation of Lessee's business and allow Lessor to inspect them on request. Lessee's failure to obtain, or loss, of any applicable licensees and shall in no way effect Lessee's obligation to pay rent hereunder.

Provided Lessee is not in default hereunder and further, provided that Lessee has not been in default in excess of more than two (2) times during the proceeding twelve (12) months prior to the exercise of this option to renew, and further, provided that Lessee gives Lessor a written notice ("Extension Notice") of not less than one hundred eighty (180) days prior to the expiration of the initial term of this lease, Lessee may elect to extend the terms of this lease for an additional two (2) five (5) year lease term periods provided Lessee is in compliance with the terms as hereinabove set forth. Lessee further agrees that any extension or option period shall provide for a rental increase of three percent (3%) of the annual rent per year for each year of the option period that Lessee elects to exercise pursuant to the terms of this paragraph. Lessee acknowledges that the rent for year 11 of this lease by way of example shall be the base rent of year 10 multiplied by three percent (3%) divided by twelve (12) which will be the new monthly rent for year 11 and the same formula will be applied for each subsequent year of the option period exercised by Lessee. Said rental increase as set forth and further defined under Schedule A, specifically defining base rental increases, shall be applied for each five (5) year option period exercised by Lessee pursuant to the terms of this paragraph. Lessee further acknowledges that Lessee shall have no more than two (2) five (5) year option periods and that each option shall require Lessee to extend the lease for a five (5) year period under the terms and conditions and subject to the pre-conditions as hereinabove set forth under the terms of this paragraph.

12

Further, the base rent per year will increase at a rate of 3% per annum over the prior base year rent should the Lessee exercise the option for the second five year option period applying the same formula as set forth hereinabove under the first five year option period.

27.   COVENANTS TO HOLD HARMLESS.

(a) Lessor and Lessee each hereby releases the other, its officers, directors, employees, and agents from any and all liability or responsibility for any loss or damage to property covered by valid and collectible fire insurance with standard and extended coverage endorsement, to the extent of the proceeds collected under such insurance policies, even if such fire or other casualties shall have been caused by the fault or negligence of the other party, or any one for whom such party may be responsible.

(b) Lessee agrees to hold harmless and indemnify Lessor, Lessor's beneficiary, any and any and all employees, agents, or persons acting on or behalf of the Lessor against all claims and liabilities, including attorneys' fees, for injuries to all persons and damage to, or theft or misappropriation or loss of property occurring in or about the Demised Premises, arising from Lessee's occupancy of the Demised Premises or the conduct of its business or from activity, work, or anything done, permitted or suffered by Lessee in or about the Demised Premises, or from any breach or default on the part of Lessee in the performance of any covenant or agreement on the part of Lessee to be performed pursuant to the terms of this Lease or due to any other act or omission of Lessee, its agents, employees, guests or invitees. In case of any action or proceeding brought against Lessor, Lessor's beneficiary, any mortgagee, master Lessor, or any of their respective agents, beneficiaries, partners, officers, servants or employees by reason of any such claims, upon notice from Lessor, Lessee covenants to defend such action or proceeding at Lessee's expense with counsel reasonably satisfactory to Lessor.

28. LIABILITY OF LESSOR TO LESSEE.  Except with respect to any damages resulting from the gross negligence of Lessor, its agents or employees, Lessee releases Lessor and Lessor's beneficiary and their respective agents, beneficiaries, partners, officers, servants and employees, from and waives all claims for damages to person or property sustained  by Lessee or by any occupant of the Demised Premises or by any other person, resulting directly or indirectly from fire or other casualty, cause or any existing or future condition, defect, matter or thing in the Demised Premises, or any part thereof, or from any equipment or appurtenance therein, or from any accident in or about the Demised Premises, or from any act or neglect of any Lessee or other occupant of the Demised Premises or any other person, including any agent, beneficiary, partner, officer, servant or employee of Lessor or of Lessor's beneficiary. This Section shall apply especially, but not exclusively, to damage caused by water, snow, frost, steam, excessive heat or cold, sewerage, any gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures, falling plaster, broken-glass, sprinkling, heating; ventilating or air conditioning systems, devices or equipment, or flooding, and shall apply without distinction as to the person whose act or neglect was responsible for the damage and whether the damage was due to any of the acts specifically enumerated above, or from any other thing or circumstance, whether of a like nature or of a wholly different nature. All personal property belonging to Lessee or any occupant of the Demised Premises or to any other person that is in the Demised Premises shall be there at the risk of Lessee or such other person only, and Lessor and Lessor's beneficiary and their respective agents, beneficiaries, partners, officers, servants and employees shall not be

13

liable for damage thereto or theft or misappropriation thereof.

29. ENVIRONMENTAL MATTERS. Upon termination of this Lease, Lessee agrees to remove and dispose of all waste, garbage, toxic and hazardous materials from the Demised Premises. Lessee agrees to conform with all applicable federal, state and local statutes, ordinances, rules and regulations in the storage, use, removal and disposal of such waste, garbage, toxic and hazardous materials. Lessee agrees to indemnify, protect and save harmless Lessor from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, reasonable attorneys' fees and expenses) imposed upon or incurred by or asserted against Lessor by reason of the storage, use, removal and disposal of such waste, garbage, toxic and hazardous materials or the failure to remove and dispose of same. Nothing herein contained shall be deemed to authorize (and Lessee shall not be authorized or permitted) to maintain or use materials within the Demised Premises which contain hazardous or toxic substances which are regulated by federal or local law or pose a health, safety or environmental hazard.

30. RETURN OF DEMISED PREMISES. Upon the expiration or termination of this Lease, Lessee shall quit and surrender the Demised Premises, to Lessor in good order, broom clean, normal wear and tear and acts of God excepted. Subject to the other terms of this Lease, Lessee shall, at its expense, remove all property of Lessee, all alterations to the Demised Premises not wanted by Lessor, and repair damage caused by such removal and return the Demised Premises to the condition in which they were prior to the installation of the articles so removed. If needed by Lessor, upon the expiration or termination of this Lease, Lessee shall execute and acknowledge a quit-claim deed of Lessee's interest in the Demised Premises, in recordable form, in favor of the Lessor ten (10) days after written notice and -demand therefore by Lessor, and Lessee hereby appoints Lessor its attorney-in-fact, irrevocably, to execute and deliver such quit-claim deed should Lessee timely fail to do so.

31. HOLDING OVER. If Lessee shall hold possession of the Demised Premises after the expiration or termination of this Lease, at Lessor's option (i) Lessee shall be deemed to be occupying the Demised Premises as a Lessee from month-to-month, at double the Minimum Rent in effect during the last Lease Year immediately preceding such holdover and otherwise subject to all of the terms and conditions of this Lease, or (ii) Lessor may exercise any other remedies it has under this Lease or at law or in equity including an action for wrongfully holding over. No payment by Lessee, or receipt by Lessor, of a lesser amount than the correct rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or letter accompanying any check for payment of rent or any other amounts owed to Lessor be deemed to effect or evidence an accord and satisfaction, and Lessor may accept such check or payment without prejudice to Lessor's right to recover the balance of the rent or other amount owed or to pursue any other remedy provided in this Lease.

32. PRIOR AGREEMENTS AND AMENDMENTS. Accept as otherwise provided herein, no subsequent amendments, letters of intent or prior communications whether oral or written concerning the leasing of the Demised Premises shall not be binding on the Lessor and Lessee and that the terms and conditions of this Lease shall at all times supercede and take precedent over any said communications whether written or oral pertaining to the Lease. All said matters shall be considered merged into and made part of this Lease.

14

33. ENVIRONMENTAL COMPLIANCE. This paragraph shall not limit the generality of any other provision of this Lease requiring Lessee to comply with applicable requirements of law. The term "Hazardous Substance", as used in this paragraph 33, shall mean, without limitation, any wastes, materials, or substances (whether solid, liquid or gaseous, and whether or not airborne) which: (i) are or may be deemed to include flammables, urea formaldehyde, explosives, radioactive materials, asbestos, polychlorinated biphenyls (PCBs), chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, or toxic products; (ii) substances declared to be hazardous or toxic "substances", "wastes", or "materials" under any law or regulation now or hereafter enacted or promulgated by any governmental authority, including, but without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended; the Hazardous Materials Transportation Act, as amended; the Resource Conservation and Recovery Act, as amended; and regulations in promulgation of each of the above; and (iii) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or mayor could pose a hazard to the health and safety of the occupants of the Building or the owners and/or occupants of property adjacent to or surrounding the building.

Lessee shall not cause or permit to occur:

Any violation of any federal, state, or local law, ordinance, or regulation now or hereafter enacted, related to environmental conditions on, under or about the Premises, or arising from Lessee's use or occupancy of the Premises, including, but not limited to, soil and ground water conditions; or the use, generation, release, manufacture, refining, production, processing, storage, or disposal of any Hazardous Substance on, under, or about the Premises, or the transportation to or from the Premises of any Hazardous Substances.

Lessee shall, at Lessee's expense, comply with all laws regulating the use, generation, storage, transportation, or disposal of Hazardous Substances (the "Laws").

Lessee shall, at Lessee's expense, make all submissions to, provide all information required by, and comply with all requirements of all governmental authorities (the "Authorities") under the Laws.

If any Authority or any third party demands that a clean-up plan be prepared and that a cleanup be undertaken because of any deposit, spill, discharge, or other release of Hazardous Substances that occurs during the Term of the Lease, at or from the Premises, Building, or Land, or which arises at any time from Lessee's use or occupancy of the Premises, then Lessee shall, at Lessee's expense, prepare and submit the required plans and all related bonds and other financial assurances; and Lessee shall carry out all work required by such clean-up plans, but only upon Lessor's prior written consent, except in cases of emergency. Lessee shall not enter into any settlement agreement, consent decree or other compromise with respect to any claims relating to any Hazardous Substances in any way connected to the Premises, Building or Land without first obtaining Lessor's written consent and affording Lessor the reasonable opportunity to participate in such proceedings.

Lessee shall promptly provide all information regarding the use, generation, storage, transportation or disposal of Hazardous Substances that is required by Lessor. If Lessee fails to fulfill any duty imposed under this paragraph within a reasonable time, Lessor may do so; and in

15

such case, Lessee shall cooperate with Lessor in order to prepare all documents Lessor deems necessary or appropriate to determine the applicability of the Laws to the Premises and Lessee's use thereof, and for compliance therewith, and Lessee shall execute all documents promptly upon Lessor's request. No such action by Lessor and no attempt made by Lessor to mitigate damages under any Law shall constitute a waiver of any of Lessee's obligations under this paragraph.

Notwithstanding the other limitations contained within this paragraph, in event of any storage, release, incident of any kind, whether reportable or not, or incident perceived to have happened by a governmental entity involving a Hazardous Substance:

Lessee shall provide Lessor with complete copies of all communications, permits or agreements with, from or issued by any governmental authority or agency (federal, state or local) or any private entity relating in any way to the presence, release, threat of release, or placement of Hazardous Substances on or in the Premises or any portion of the Building or land, or the generation, transportation, storage, use treatment or disposal, at, on, in or from the Premises of any Hazardous Substances.

Lessee covenants to investigate, clean-up and otherwise re-mediate any release of Hazardous Substances caused, contributed to or created by: (i) Lessee or any of Lessee's officers, directors, invitees, agents, employees, contractors or representatives at its sole expense; or (ii) any third party other than Lessor or another Lessee, their or its agents. Such investigation and remediation shall be performed only after Lessee has obtained Lessor's prior written consent; provided, however that Lessee shall be entitled to respond immediately to any emergency without first obtaining said consent. All remediation shall be performed in strict compliance with the Laws and to the satisfaction of Lessor.

Upon reasonable request by Lessor, Lessee shall provide Lessor with the results of appropriate tests of air, water and/or soil to demonstrate that Lessor complies with this paragraph and all applicable Laws with respect to the Premises, Building and/or Land.

Lessor and its agents shall have the right to enter the Premises and/or conduct appropriate tests for the purposes of ascertaining' Lessee's compliance with this paragraph and all Laws with respect to the Premises, Building and/or Land.

Lessee's obligations and liabilities under this paragraph shall survive the expiration or Termination of this Lease.

34. LOCKS. Lessee may not change any locks on the Demised Premises without Lessor's prior written consent. It is specifically understood that all locks within the building must be keyed to a master cylinder for the entire building and that all times Lessor shall maintain a master key for the subject premises. Further, in the event Lessor shall wish to place an appropriate master key with the fire protection district for access to the subject premises in the event of emergencies such placement of a key on the Demised Premises or supplying a key to the fire protection agency shall not constitute any violation under the terms of this Lease.

35. PLURAL/SUCCESSORS. The words "Lessor" and "Lessee" wherever herein occurring and used shall be construed to mean "Lessor" and "Lessees" in case more than one person constitutes

either party to this Lease; and all the covenants and agreements contained shall be binding upon, and inure to, their respective successors, heirs, executors, administrators and assigns and may be exercised by his or their attorney or agent, except as otherwise limited in this Lease.

36. AUTHORITY OF LESSEE. If Lessee is a corporation, partnership, association or any other entity, it shall deliver to Lessor, concurrently with the delivery to Lessor of an executed Lease, certified resolutions of Lessee's directors or other governing person or body: (i) authorizing execution and delivery of this Lease and the performance by Lessee of its obligations hereunder; and (ii) certifying the authority of the party executing the Lease as having been duly authorized to do so.

37. WAIVER OF TRIAL BY JURY. To the full extent permitted by law, Lessee hereby waives all right to trial by jury and any claim, action, proceeding or counter claim by Lessor against Lessee and any matter arising out of or in anyway connected with this Lease, the relationship of Lessor/Lessee, for Lessee's use and occupancy of the leased premises and/or any emergency or statutory remedy.

38. LESSOR'S EXCULPATION. Notwithstanding any thing contained herein to the contrary, Lessor shall have no personal liability with respect to any provisions of this Lease and Lessee shall look solely to the estate and property of Lessor in the real property and structures compromising the Lessor's parcels for the satisfaction of all Lessee's claims, including the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by Lessor in the event of any default or breach by Lessor with respect to any of the terms and provisions of this Lease (subject, however, to the prior rights of any holder of any mortgage or ground lease covering all or part of the Demised Premises), and no other assets of Lessor or any principle of Lessor shall be subject to levy, execution or other judicial process for the satisfaction of Lessee's claim. This section shall inure to the benefit of Lessor's successors and assigns.

39. STANDARD MAINTENANCE. Lessee agrees to be responsible to arrange with a qualified approved contractor the change of filters for HVAC systems no less than three (3) times per year and further, Lessee shall be responsible for all annual maintenance of the HVAC system. The Lessee shall be responsible at all times for the maintenance and repair of the HVAC systems in the Demised Premises. Also, the Lessee shall obtain at Lessee's expense and shall maintain throughout the lease term and any extensions thereof service contract with a contractor reasonably acceptable to Lessor which shall provide a minimum of semi annual maintenance and repair and maintenance of said HVAC systems, said maintenance contracts to conform to all requirements under the warranty, if any on said systems. Lessee shall deliver a copy of said contract to Lessor prior to the term commencement date and Lessor shall to the permitted extent of said warranties assign the benefit of the warranty on the HVAC systems to Lessee with such warranty to be assigned back to Lessor at the end of the lease term.

40. MAINTENANCE OF FIRE PROTECTION SYSTEMS. During the Term, Lessee agrees to employ at its sole expense a suitable contractor approved by Lessor, which approval shall not be unreasonably withheld, to perform Lessee's obligations for maintenance of all fire protection systems within the Premises, excluding the sprinkler system, if any. Such maintenance shall include at least semiannual inspections and cleaning of the units and systems, together with such adjustments and servicing as such inspection discloses to be required and, in addition, all repairs, replacements, testing, and servicing as shall be necessary or reasonably required by

17

Lessor. Nothing contained in this paragraph shall be deemed to be a guarantee by Lessor of the performance or responsibility of any contractor approved by Lessor as herein provided, and Lessee hereby waives all claims against Lessor for damages to persons or property sustained by Lessee or any person claiming through Lessee resulting from or in any way concerned with Lessor's employment of a contractor pursuant to the provisions of this paragraph.

41. LESSOR'S OBLIGATIONS. Lessor shall keep in good repair the structural supports, exterior walls, and foundations of the Demised Premises, Except with respect to any damages resulting from the gross negligence of Lessor, its agents or employees, Lessee releases Lessor and Lessor's beneficiary and their respective agents, beneficiaries, partners, officers, servants and employees, from and waives all claims for damages to person or property sustained by Lessee or by any occupant of the Demised Premises or by any other person, resulting directly or indirectly from fire or other casualty, cause or any existing or future condition, defect, matter or thing in the Demised Premises, or any part thereof, or from any equipment or appurtenance therein, or from any accident in or about the Demised Premises, or from any act or neglect of any Lessee or other occupant of the Demised Premises or any other person, including any agent, beneficiary, partner, officer, servant or employee of Lessor or of Lessor's beneficiary. This Section shall apply especially, but not exclusively, to damage caused by water, snow, frost, steam, excessive heat or cold, sewerage, any gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures, falling plaster, broken-glass, sprinkling, heating; ventilating or air conditioning systems, devices or equipment, or flooding, and shall apply without distinction as to the person whose act or neglect was responsible for the damage and whether the damage was due to any of the acts specifically enumerated above, or from any other thing or circumstance, whether of a like nature or of a wholly different nature. All personal property belonging to Lessee or any occupant of the Demised Premises or to any other person that is in the Demised Premises shall be there at the risk of Lessee or such other person only, and Lessor and Lessor's beneficiary and their respective agents, beneficiaries, partners, officers, servants and employees shall not be liable for damage thereto or theft or misappropriation thereof.

42. LESSEE'S OBLIGATIONS. If any damage to the Demised Premises or any equipment or appurtenance therein results from any act or neglect of Lessee, its agents, employees, guests or invitees, Lessee shall be liable therefore. Lessor may, upon at least five (5) days written notice to Lessee, at Lessor's option, repair such damage, and Lessee shall pay to Lessor the total cost of such repairs in excess of amounts, if any, paid to Lessor from Lessor's insurance, if any, covering such damage. If Lessor elects not to repair such damage, Lessee shall promptly repair such damage at its own cost If Lessee occupies space in which there is exterior glass, then Lessee shall be responsible for the damage, breakage or repair of such glass, except to the extent that Lessor receives proceeds from Lessor's insurance specifically covering such damages, breakage and repairs, Lessee, at its expense, shall make any and all repairs to the Demised Premises as may be necessitated by any break-in, forcible entry, or other trespass unto or upon the Demised Premises, regardless of whether or not such entry and damage is caused by the negligence or fault of Lessee, or occurs during, or after, business hours. Furthermore, Lessee shall keep and maintain all heating, ventilating and air conditioning equipment, plumbing and electrical systems and interior walls (including doors and glass windows) in good repair and all interior ceiling areas, floors, roofs, exterior lighting, plumbing, delivery parking areas, signage, landscaping and all exterior structures and systems, at Lessee's sole cost and expense, provided however, Lessee shall employ only licensed, bonded contractors, which the selection of said

contractors shall be subject to review and approval by Lessor. In the event Lessor shall disapprove of any contractors as selected by Lessee upon written notice by Lessor, Lessee shall be required to obtain other comparable contractors reasonably acceptable to Lessor.

47. MISCELLANEOUS

(a) This Lease contains the entire agreement between the parties hereto, and there are no promises, agreements, conditions, undertakings, or warranties, or representations, oral or written, between them other than as herein set forth. If any provision of this Lease shall be invalid, unenforceable, the remainder of this Lease shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(b) No notice or other communications given under this Lease shall be effective unless the same is in writing, and is delivered in person or mailed by registered or certified mail, return receipt requested, first class, postage prepaid, addressed:

(1)    If to Lessor, 191 Ashfield Court, Bloomingdale, IL 60108, or to such other person and address as Lessor shall designate by giving notice thereof to Lessee: 407 S. Lincolnway, N. Aurora, IL 60542.

(2)    If to Lessee, to 407 S. Lincolnway, North Aurora, IL 60542 or such other address as Lessee shall designate by giving notice thereof to Lessor. The date of service of any notice given by mail shall be the date on which such notice is deposited in the U.S. mails.

(c) It is the intent of the parties hereto that all questions with respect to the construction of the Lease and the rights and the liabilities of the parties hereto shall be determined in accordance with the laws of the State of Illinois without regard to any conflicts of laws provisions thereof.

(d) This Lease shall bind and inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns, as well as to other pm1ies as noted herein (i.e. Mortgagee in possession).

(e) There shall be no personal liability on Lessor's owners, members, shareholders or beneficiaries or any successor in interest with respect to any provisions of this Lease. Lessees shall look solely to the equity of the then owner of the Demised Premises for the satisfaction of any remedies of the Lessee in the event of a breach by Lessor of any of its obligations hereunder.

(f) Lessee warrants and represents that there was no broker or agent instrumental in consummating this Lease other than None. Lessee agrees to indemnify and hold Lessor harmless against any claims for brokerage or other commissions arising by reason of a breach by Lessee of this representation and warranty.

(h) The terms of this Lease shall not be interpreted to mean that Lessor and Lessee are partners or joint ventures.

(i) Lessee hereby waive trial by jury in any action, proceeding or counterclaim brought by Lessor hereto against the Lessee on or in respect of any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Lessor and Lessee hereunder, Lessee's use or occupancy of the Demised Premises, and/or any claim of injury or damage.

j) If any provision of this Lease or the application thereof to any person or circumstances shall to

19

any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(k) No failure by Lessor to insist upon the strict performance of any term, covenant, agreement, provision, condition or limitation of this Lease to be kept, observed or performed by Lessee, and no failure by Lessor to exercise any right or remedy consequent upon a breach of any such term, covenant, agreement, provision, condition or limitation of this Lease, shall constitute a waiver of any such breach or of any such term, covenant, agreement, provision, condition or limitation.

(1) The parties hereby agree that neither this Lease nor any memorandum thereof shall be recorded. If Lessee shall record this Lease or any memorandum, hereof, such event shall constitute a Default hereunder.

48.  LESSEE REQUIRED WINDOW WASHING.  Lessee agrees to keep the general appearance of building in good condition.  Further, Lessee agrees to provide specifically for window washing of all exterior windows in the Demised Premises to occur a minimum of every thirty (30) number of days.

IN WITNESS WHEREOF, the said parties hereto have hereunto set their hands and seals the day and year first above written.

Signed, sealed and delivered in the presence of:                                      LESSOR

Witness ……………………………………………………                By: ………………………………………………………
Name: ………………………………………………………                Name and title ……………………………………………

Witness ……………………………………………………                Attest: ……………………………………………………
Name: ………………………………………………………                Name and title ……………………………………………

Signed, sealed and delivered in the presence of:                                      LESSEE

Witness ……………………………………………………                By: ………………………………………………………
Name: ………………………………………………………                Name and title ……………………………………………

Witness ……………………………………………………                Attest: ……………………………………………………
Name: ………………………………………………………                Name and title ……………………………………………

GUARANTEE

The undersigned, waiving demand and notice hereby, jointly and severally, unconditionally guarantee the performance of all duties and obligations of _____ (LESSEE) under this Lease, and personally agree that said Lease shall be binding on each of us personally, as if each of us were the Lessee.

Signed, sealed and delivered in the presence of:

| _____ | _____ |
| Witness | Individually |
| _____ | _____ |
| Witness | Individually |
| _____ | _____ |
| Witness | Individually |

SCHEDULE A

| ORIGINAL TERM LEASE | BASE RENTAL | ANNUAL RENT |
|---|---|---|
| May 1, 2007 | $10,000.00 | $120,000.00 |
| August 1, 2008 | $10,300.00 | $123,600.00 |
| August 1, 2009 | $10,609.00 | $127,308.00 |
| August 1, 2010 | $10,927.27 | $131,127.24 |
| August 1, 2011 | $11,255.09 | $135,061.08 |

21

| OPTION 1 LEASE | BASE RENTAL | ANNAUL RENT |
|---|---|---|
| August 1, 2012 | $11,592.74 | $139,112.88 |
| August 1, 2013 | $11,940.52 | $143,286.24 |
| August 1, 2014 | $12,298.74 | $147,584.88 |
| August 1, 2015 | $12,667.70 | $152,012.40 |
| August 1, 2016 | $13,047.73 | $156,572.76 |

| OPTION 2 LEASE | BASE RENTAL | ANNUAL RENT |
|---|---|---|
| August 1, 2017 | $13,439.16 | $161,269.92 |
| August 1, 2018 | $13,842.34 | $166,108.08 |
| August 1, 2019 | $14,257.61 | $171,091.31 |
| August 1, 2020 | $14,685.34 | $176,224.08 |
| August 1, 2021 | $15,125.90 | $181,510.80 |

# EXHIBIT F

**Worthen David E**

| | |
|---|---|
| **From:** | Worthen David E |
| **Sent:** | Tuesday, July 17, 2007 2:23 PM |
| **To:** | 'Himanshu Patel' |
| **Subject:** | FW: Tejany |

**From:** Worthen David E
**Sent:** Thursday, July 12, 2007 10:41 AM
**To:** Robert Salkowski
**Subject:** Tejany

Robert,

I received your voicemail. Thanks for following up. There is additional information that Dunkin' requires in order to facilitate the sale of the shops. Specifically, Dunkin' needs the following:

- Third party landlord contact information - incoming fees need contact information in order to work through assignments
- Tax Returns - several purchasers have asked for tax returns for the corps/shops. Please forward the last three years worth of tax returns for the corporations.
- Leases - Dunkin' still needs the leases at 336427 - 407 S Lincolnway, North Aurora, IL. and 340339 - 15 E Ogden Ave, Westmont IL.
- Assignment issue - PC 330402 - 2543 W Algonquin Rd, Algonquin, IL - in reviewing the lease, section 10.01 states there shall be no assignments. Obviously, this makes a sale of the shop impossible. This lease needs to be assigned directly to the incoming fee. In order to move forward with this acquisition, the ability to assign the lease needs to be confirmed.

Please get back to me asap on these items. Thanks.

David

David E. Worthen
Gray Plant Mooty
2600 Virginia Avenue, N.W.
Suite 1000
Washington, D.C. 20037-1931
Tel: (202) 295-2203
Fax: (202) 295-2253
david.worthen@gpmlaw.com
www.gpmlaw.com

11/6/2007

**EXHIBIT G**

| Store Name | STORE PC # | Landlords |
|---|---|---|
| WOODSTOCK | 304652 | Centerville Properties |
| GENEVA | 330933 | John Mallios |
| ALGONQUIN | 330402 | Algonquin Center |
| HODGKINS | 310404 | Inland Commercial Property |
| WESTCHESTER | 300211 | Westbrook Commons |
| WOODDALE | 331015 | Allied Domecq |
| AMOCO | 306710 | B.P.Amoco |
| ELGIN | 310222 | Allied Domecq |
| HINSDALE | 306280 | Allied Domecq |
| NORTH AURORA | 336427 | Farida Sadruddin |
| WILLOWBROOK | 306395 | Allied Domecq |
| WESTMONT | 340339 | Dana M. Embree |

Address

47 Country cub, LLC 12545 Farm hill Drive Huntley, IL 60142

7438 N. Kilbourn Ave Skokie, IL 60076

3190 Doolittle Drive, Northbrook IL 60062

4575 Paysphere Circle Chicago, IL 60674

Westbrook Commons c/o Regency Centers LP 1568 Solution center Chicago, IL 60677-1005

Rent payment through EPAY (EFT)
Property Services 150 West Warrenville Rd - Bldg 200 Naperville IL 60563

Rent payment through EPAY (EFT)

Rent payment through EPAY (EFT)


Rent payment through EPAY (EFT)

429 Fuller Rd Hinsdale IL 60521

# EXHIBIT H

Dunkin' Brands, Inc.
130 Royall Street, MS 3 East A
Canton, MA  02021
Direct Dial Phone:  781-737-3427
Direct Dial Fax:   781-737-4427
E-mail:  tracy.giuffrida@dunkinbrands.com
Main Phone:  781-737-3000

                    "Michael
                    Boxerman"                                              beaml
        T
            ac>     KiDeeuirdc>
                            <Tracy.Giuffrida@dunkinbrands.com>
                    10/29/2007 10:05                                   cc
                    AM                          "DeGroat, Eric J."
                                                <EDeGroat@ClarkHill.com>, "Ira
                                                Marcus" <IraMarcus@mbclegal.com>,
                                                "Seamus Ryan" <sryan@mbclegal.com>
                                                                    Subject
                                                RE: FW: Illinois orders

Kevin,

If you're asking for the PIN numbers, I don't have them.  As far as Cook
County, I know you can go to the Cook Co. Assessor's web site to get it.
I'm not sure about McHenry and DuPage.

-----Original Message-----
From: Kevin.Duperre@dunkinbrands.com
[mailto:Kevin.Duperre@dunkinbrands.com]
Sent: Monday, October 29, 2007 9:00 AM
To: Tracy.Giuffrida@dunkinbrands.com
Cc: DeGroat, Eric J.; Michael Boxerman
Subject: Re: FW: Illinois orders

Michael, we're running some lien searches on the sites below and need
some
add'l info - can you please provided as soon as possible?   thanks

Kevin Duperre
Director, Business Development - Franchising
Office:  781.293.5541
Mobile:  617.312.0965
Fax:  781.737.4328

                    Tracy

```
            Giuffrida/ADRUS/A
            DR/A-D
To
                              "DeGroat, Eric J."
            10/29/2007 08:12  <EDeGroat@ClarkHill.com>, Kevin
            AM                Duperre/ADRUS/ADR/A-D@ADRUS

cc

Subject
                              Re: FW: Illinois orders(Document
                              link: Kevin Duperre)
```

kevin

Can you get these from the seller or their attorney?


Tracy A. Giuffrida
Senior Real Estate Paralegal
Dunkin' Brands, Inc.
130 Royall Street, MS 3 East A
Canton, MA  02021
Direct Dial Phone:  781-737-3427
Direct Dial Fax:    781-737-4427
E-mail:  tracy.giuffrida@dunkinbrands.com
Main Phone:  781-737-3000


            "DeGroat, Eric
            J."
            <EDeGroat@ClarkHi
To

                              16

```
              ll.com>
<Tracy.Giuffrida@dunkinbrands.com>

cc
              10/26/2007 03:03

              PM
Subject
                          FW: Illinois orders
```

Tracy, the local address for our leased unit is probably different than the
tax parcel address.  Can you get the tax parcel's for the 3 properties
below from the tax department and forward to me:

PC #300211 - 3019 Wolf Road, Westchester, IL 60559 (Cook County)


PC #340339 - 15 E. Ogden Avenue, Westmont, IL 60559 (DuPage County)


PC #340391 - 339 South Eastwood Dr., Woodstock, IL 60098 (McHenry
County)


Eric DeGroat
Clark Hill PLC
255 S. Old Woodward Avenue, 3rd Floor
Birmingham, Michigan 48009
248-988-5863  Dir.
248-642-2174 Fax


From: Nadolski, Steve [mailto:SNadolski@LANDAM.com]
Sent: Friday, October 26, 2007 2:51 PM
To: DeGroat, Eric J.
Cc: Damschroder, Tracie
Subject: Illinois orders

Eric, our Chicago office can not pull up anything on the addresses you
sent
for the title searches. Do you have anything else? Tax ID numbers, legal
descriptions?

Steve Nadolski,
SR. National Account Executive
Phone:  248-816-3822    Fax: 248-649-1626
1050 Wilshire Dr. Suite 310, Troy, MI 48084

LandAmerica Commercial Services

Your Solution for Real Estate Transaction Services


Title and Escrow (Commonwealth, Lawyers Title, Transnation) * Property
Condition & Environmental Assessments * Valuations * Surveys * Zoning *
Tax
Services * Flood Certificates * UCC Insurance * 1031 Exchanges *
International * TIC Services
A Fortune magazine 2006 Most Admired Company

LEGAL NOTICE: This e-mail is for the exclusive use of the intended
recipient(s). If you are not an intended recipient, please notify the
sender by reply e-mail or by calling (313) 965-8300, delete the e-mail
from
your computer and do not copy or disclose it to anyone else.
Unauthorized
disclosure, copying, distribution, reliance or use is prohibited.
Neither
this e-mail nor its attachment(s) establish an attorney-client
relationship, constitute an electronic signature or provide consent to
contract electronically, unless expressly so stated by a Clark Hill
attorney in the body of this e-mail or an attachment.


FEDERAL TAX ADVICE DISCLAIMER: Under U. S. Treasury Regulations, we are
informing you that, to the extent this message includes any federal tax
advice, this message is not intended or written by the sender to be
used,
and cannot be used, for the purpose of avoiding federal tax penalties.


************************************************************
This e-mail message, including any attachments, is for the sole use of
the
addressee(s) to whom it has been sent, and may contain information that
is
confidential or legally protected. If you are not the intended
recipient
or have received this message in error, you are not authorized to copy,
distribute, or otherwise use this message or its attachments. Please
notify the sender immediately by return e-mail and permanently delete
this
message and any attachments. Dunkin' Brands Inc. makes no warranty that
this e-mail is error or virus free.


************************************************************
This e-mail message, including any attachments, is for the sole use of
the
addressee(s) to whom it has been sent, and may contain information that
is
confidential or legally protected. If you are not the intended
recipient
or have received this message in error, you are not authorized to copy,
distribute, or otherwise use this message or its attachments. Please
notify the sender immediately by return e-mail and permanently delete
this
message and any attachments. Dunkin' Brands Inc. makes no warranty that